| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS | DEFENDANTS |
|---|---|
| | |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| | |

| PARTY (Check One Box Only)<br>□ Debtor    □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor    □ Other<br>□ Trustee | PARTY (Check One Box Only)<br>□ Debtor    □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor    □ Other<br>□ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| □ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand  $ |

Other Relief Sought

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR | BANKRUPTCY CASE NO. | |
| DISTRICT IN WHICH CASE IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>/s/ Patrick R. Linsey | | |
| DATE | PRINT NAME OF ATTORNEY (OR PLAINTIFF) | |

### INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

-------------------------------------------------------x
                     :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| HO WAN KWOK, *et al.*,[1] | : | Case No. 22-50073 (JAM) |
| | : | |
| Debtors. | : | (Jointly Administered) |

-------------------------------------------------------x

| | | |
|---|---|---|
| Genever Holdings Corporation, | : | |
| | : | |
| Plaintiff. | : | Adv. Proceeding No. [_____] |
| v. | : | |
| | : | |
| Bravo Luck Limited, | : | |
| | : | |
| Defendant. | : | December 23, 2022 |
| | : | |

-------------------------------------------------------x

**GENEVER HOLDINGS CORPORATION'S ADVERSARY COMPLAINT AGAINST BRAVO LUCK SEEKING (I) INVALIDATION OF PURPORTED TRUST AGREEMENT IN FAVOR OF BRAVO LUCK AND, (II) IN ALTERNATIVE, RULING THAT GENEVER HOLDINGS CORPORATION EFFECTUATED FRAUDULENT TRANSFER IN FAVOR OF BRAVO LUCK PURSUANT TO SECTION 276 OF NEW YORK DEBTOR AND CREDITOR LAW, MADE APPLICABLE BY <u>SECTION 544 OF BANKRUPTCY CODE</u>**

Genever Holdings Corporation (the "<u>Plaintiff</u>" or "<u>Genever BVI</u>"), debtor in the above

captioned jointly administered chapter 11 cases (the "<u>Chapter 11 Cases</u>" and Genever BVI's case

the "<u>Genever BVI Chapter 11 Case</u>") of Ho Wan Kwok ("<u>Kwok</u>"), brings this adversary

---

[1] The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

complaint (the "Complaint") against defendant Bravo Luck Limited ("Bravo Luck" or the "Defendant").[2]

## NATURE OF ACTION

1.      The Plaintiff commences this adversary proceeding to remedy Kwok's attempt to use subterfuge to keep valuable property out of the reach of creditors.  Genever Holdings LLC ("Genever US"), a company whose sole member is Genever BVI, of which Kwok was the sole shareholder prior to the transfer of his interest to the Trustee following the Trustee's appointment, holds title to Kwok's apartment at the Sherry Netherland Hotel in Manhattan (the "Sherry Netherland Apartment").[3]  Kwok, however, when he was in control of Genever US and Genever BVI (together, the "Genever Entities")) and as part of his overarching strategy of using shell companies to hide his assets and "judgment proof" himself against creditors' claims, caused Genever US to take the position that Bravo Luck, a company purportedly owned by Qiang Guo, Kwok's son ("Kwok's Son"), is the true beneficial owner of the Genever Entities pursuant to a purported trust agreement allegedly dated February 17, 2015 (the "Purported Trust Agreement").

2.      As an initial matter, the Purported Trust Agreement is a fraudulent, backdated document as evidenced by voluminous evidence in the record of the Kwok Chapter 11 Case, the Genever US Chapter 11 Case, and the prepetition litigation (the "State Court Action") between Pacific Alliance Asia Opportunity Fund L.P. ("PAX") and Kwok in New York state court (the

---

[2] Luc A. Despins, in his capacity as the chapter 11 trustee (the "Trustee") appointed in Kwok's chapter 11 case (the "Kwok Chapter 11 Case"), through his possession of 100% shares of Genever Holdings Corporation (sole member of Genever US) has filed a similar complaint in the Kwok Chapter 11 Case, as did Genever US in the Genever US chapter 11 case, which had previously been pending in the Southern District of New York [Case No. 20-12411 (JLG)] (the "Genever US Complaint" and the "Genever US Chapter 11 Case").  The Genever US Complaint was filed out of an abundance of caution because the two-year statute of limitations set forth in section 546(a) of the Bankruptcy Code, which may govern some of the claims asserted in the Genever US Complaint, would have expired on October 12, 2022.

[3] Kwok's residence at the Sherry Netherland technically consists of multiple units located on the 18th floor that for ease of reference will be referred to collectively as the Sherry Netherland Apartment.

"State Court").  Most notably, although the Purported Trust Agreement was allegedly executed in 2015, Kwok did not produce the Purported Trust Agreement until April 2019, over four years after its alleged execution, despite numerous instances in which it would have and should have been disclosed had it existed, such as when PAX sought discovery regarding Kwok's ownership of the Sherry Netherland Apartment, and when Kwok argued the apartment could not be attached by PAX because it was subject to pledges in favor of or was owned by third parties (other than Bravo Luck).  Because the Purported Trust Agreement is fraudulent, it is invalid, void, and unenforceable.

3.      In the alternative, even assuming the Purported Trust Agreement is valid, Genever BVI (when controlled by Kwok) used the Purported Trust Agreement to effectuate a transfer of its interest in Genever US with actual intent to hinder, delay or defraud creditors.  The Plaintiff is therefore entitled to a ruling declaring the Purported Trust Agreement invalid and avoiding any conveyance of property or any incurrence of any obligation that occurred pursuant thereto.[4]

## **PARTIES**

4.      Plaintiff Genever BVI is a debtor in the above-captioned Chapter 11 Cases.

5.      Bravo Luck is an entity incorporated in the British Virgin Islands ("BVI") purportedly owned by Kwok's Son.  Bravo Luck has asserted that, pursuant to the Purported Trust Agreement, it is the beneficial owner of the Sherry Netherland Apartment, title to which is held by Genever US.  Bravo Luck has asserted this beneficial ownership claim (as well as an alternative unsecured claim of approximately $76 million based on Bravo Luck having allegedly

---

[4] *See* N.Y. Debt. & Cred. Law § 276 (McKinney) ("Every conveyance made ***and every obligation incurred*** with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.") (emphasis added).

paid for the Sherry Netherland Apartment) in its proof of claim filed in the Genever US Chapter 11 Case [Claim No. 4-1] (the "Bravo Luck Proof of Claim").

6.      Kwok's Son is the purported owner of Bravo Luck.

## FACTS

### A.      Kwok's Shell Game

7.      As established in the State Court Action, Kwok's *modus operandi* for years has been to use family members and shell companies to shield his assets from creditors.  The State Court accurately referred to Kwok's asset protection strategy as a "shell game" numerous times in hearings and written decisions and orders in the State Court Action.

8.      Kwok's shell game has allowed him to continue, up to this day, to deny having any assets and refuse to pay his debts to creditors while simultaneously (1) enjoying all the benefits of massive wealth, such as yachts, private planes, and luxury cars and lodging; (2) spending millions of dollars on the attorneys' fees necessary to litigate against PAX, the Trustee, and numerous other parties; and (3) engaging in his daily business of peddling disinformation, conspiracy theories, and cryptocurrency schemes.[5]

9.      The aspect of Kwok's shell game most critical to this adversary proceeding (i.e., Kwok's use of Bravo Luck to shield the Sherry Netherland Apartment from creditors), ***is only one example*** of Kwok's massive abuse of the corporate form to judgment-proof himself and keep creditors at bay.  Kwok has, upon information and belief, established numerous, potentially

---

[5] *See, e.g.*, Friedman, Dan. "A Fugitive Chinese Tycoon Met Steve Bannon. Misinformation Mayhem Ensued." *Mother Jones*, March-April 2022, https://www.motherjones.com/politics/2022/02/guo-wengui-miles-guo-gettr-steve-bannon/; Whalen, Jeanne, et al. "Chinese Businessman with Links to Steve Bannon Is Driving Force for a Sprawling Disinformation Network, Researchers Say." *The Washington Post*, 17 May 2021, https://www.washingtonpost.com/technology/2021/05/17/guo-wengui-disinformation-steve-bannon/; Hui, Echo, and Hagar Cohen. "After John Left a Conspiracy-Sharing Group, the Billionaire Founder Told Followers He 'Deserved to Die'." *ABC News*, 1 Nov. 2020, https://www.abc.net.au/news/2020-11-01/behind-the-scenes-of-the-guo-and-bannon-led-propaganda-machine/12830824/.

hundreds, of entities (including many, like Bravo Luck, in off-shore jurisdictions such as BVI), that he uses to hold or transfer property so that he can avoid liability and protect assets from creditors.  To the extent Kwok has caused these entities to acquire assets, the funds used for such acquisitions belonged to Kwok.

10.    Certain of Kwok's important shell companies include, in addition to Bravo Luck:

a)    **Golden Spring (New York) Ltd ("Golden Spring")**.  Golden Spring is a Delaware entity that pays Kwok's expenses so Kwok can live in luxury while claiming to own no assets and earn no income.

(1)    Purportedly owned indirectly by Kwok's Son,[6] Golden Spring was established and funded by Kwok through a transfer of funds from one of his bank accounts in Hong Kong to the bank account of Golden Spring in New York in 2015.[7]  There is no evidence in the record regarding how Kwok's son, born in February 1987 and thus 27 or 28 years old in 2015, could have had the independent financial means to establish and fund Golden Spring (or any other entities he is purported to own) himself.[8]

(2)    A court order issued in Hong Kong on October 18, 2018, titled the Restraint Order Prohibiting Disposal of Assets In Hong Kong and Elsewhere (the "Hong Kong Restraint Order), identified Golden Spring's parent company, China Golden Spring Group (Hong Kong) Limited, as one of a number of entities whose bank accounts were "subject to the effective control of Kwok."[9]

---

[6] *See, e.g.*, Ex. 1, Wang Dep. Tr. at 18:17-18 (testimony that Golden Spring 100% owned by China Golden Spring (Hong Kong)); 17:3-4 (describing Kwok's Son as owner of "Golden Spring").

[7]  In a 2016 affidavit filed in the New York Supreme Court in connection with Ace Decade's litigation against UBS, Kwok stated that Golden Spring was established "by transferring funds from one of my accounts at UBS to Golden Spring New York's JPMorgan Chase bank account in New York."  Ex. 2, Affidavit of Kwok Ho Wan, dated February 5, 2016, in *Ace Decade Holdings Limited vs. UBS AG*, Index No. 653316/2015 (N.Y. Sup. Ct.) at ¶ 36.

[8] *See* Ex. 104, Copy of Passport.

[9] Ex. 3, Hong Kong Restraint Order ¶ 3, Respondent 22.

(3)     Kwok has testified that Golden Spring has been paying his living expenses since 2015.[10]  Golden Spring has also been paying the fees of Kwok's counsel and millions of dollars of maintenance fees associated with the Sherry Netherland Apartment, among other payments.

(4)     Golden Spring's president, Yan Ping ("Yvette") Wang ("Ms. Wang") has testified that Golden Spring is Kwok's "family office."[11]  She has also testified that in her capacity as president of Golden Spring she "serve[d] as an administrator for *the interests of [Kwok]* and his family."[12]

(5)     At the same deposition, Ms. Wang could not identify a single person who worked at Golden Spring prior to February 2018, except for Kwok's personal chauffeur, nor could she identify any business purpose of Golden Spring other than that of serving as Kwok's "family office" and starting Kwok's social media platform.[13]

(6)     During the State Court Action, Golden Spring's counsel appeared at depositions for Kwok, and Kwok's counsel represented Ms. Wang, president of Golden Spring, in connection with her deposition.[14]

(7)     Golden Spring's address at 162 East 64th Street, New York, New York 10065 has been used as the address of Kwok and numerous affiliated entities, including HK USA (defined below) and Greenwich Land LLC.[15]

---

[10] *See* Ex. 4, Tr. of Telephonic 341 Meeting of Creditors, dated April 6, 2022 at 85:17-19.  *See also* Ex. 5, Letter from Melissa M. Carvalho, dated February 1, 2021 at ¶ 8. ("Mr. Kwok responds that his expenses during the relevant time period have been paid for by Golden Spring (New York) Ltd.").

[11] Ex. 6, Wang Dep. Tr. at 20:10-16 (Q: "What business is Golden Spring Hong Kong in? A: Family office. Q: Whose family? A: The Guo family. Q: Mr. Kwok's family? A: Yes.).

[12] *Id.* at 46:20-23 ("Q: I'm asking you whether or not you serve as an administrator for Mr. Kwok's interests? A: Yes.") (emphasis added).  *See also* Ex. 7, May 15, 2018 Affidavit of Yan Ping Wang in *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.) (ECF 182) at ¶ 1. ("I am the President of Golden Spring (New York) Ltd., and in that capacity serve as an administrator for the interests of [Kwok] and his family.").

[13] *See* Ex. 6, Wang Dep. Tr. at 39:20-40:8.

[14] *See* Ex. 8, Kwok Dep. Tr. at 8:8-9 ("Karin Maistrello, Golden Spring, for Defendant"); Ex. 6, Wang Dep. Tr. At 6:9-11 (Jillian Searles identified by Ms. Wang as her attorney after entering an appearance "for defendant Kwok Ho Wan").

[15] *See, e.g.*, Ex. 9, Limited Liability Company Agreement of HK International Funds Investments (USA) Limited, LLC, dated April 1, 2019; Ex. 106, Greenwich Land LLC Real Property Tax Assessor Record, dated July 15, 2021.

(8)     Ms. Wang, president of Golden Spring, is the authorized signatory on official documents filed with courts and administrative agencies by multiple of Kwok's shell companies.[16]

b)     **Lamp Capital LLC ("Lamp Capital").**  Lamp Capital is a Delaware entity,[17] purportedly owned by Kwok's Son,[18] that also contributes to the payment of Kwok's expenses so that he can maintain his lifestyle while claiming to own no assets and earn no income.

(1)     Lamp Capital's sole member is Infinity Treasury Management, Inc.,[19] of which Kwok's Son is the purported sole shareholder, Kwok's associate Max Krasner is director and officer,[20] and Kwok's associate Daniel Podhaskie is a former director and officer.[21]

(2)     Mr. Podhaskie is or was an authorized signatory for Lamp Capital.[22]

(3)     Corporate filings related to Lamp Capital LLC were handled by Hodgson Russ LLP, counsel to Kwok in the State Court Action.[23]

---

[16] *See e.g.*, Ex. 10, Verified Complaint, *Genever Holdings, LLC v. Sherry-Netherland, Inc.*, 16-cv-06246 (S.D.N.Y. Aug. 5, 2016), ECF No. 1; Ex. 29, Himalaya Coin Certificate of Assumed Name, dated March 14, 2020, at 1 of 2, and Ex. 30, Himalaya Dollar Certificate of Assumed Name, dated March 14, 2020, at 1 of 2.

[17] *See* Ex. 12, Certificate of Incorporation of Lamp Capital LLC, dated Sept. 4, 2020 at 1.

[18] Ex. 4, Tr. of Telephonic 341 Meeting of Creditor, at 50:6-7.

[19] Ex. 13, Limited Liability Company Agreement of Lamp Capital, LLC, dated September 8, 2020.

[20] *See* Ex. 14, Infinity Treasure Management Unanimous Consent. Mr. Krasner's other roles have included, among others, serving as representative of Greenwich Land in connection with certain property transactions, as incorporator of GTV Media Group, Inc. (a subsidiary of Saraca), and as president, treasurer, and director of the Rule of Law Foundation III Inc., a purported nonprofit entity linked to Kwok.  *See* Ex. 15, Greenwich Land Warranty Deed, dated April 26, 2022, at 212; Ex. 16, GTV Media Group Certificate of Incorporation, dated April 17, 2020, at 2; Ex. 17, Rule of Law Foundation III Inc. Certificate of Incorporation, dated January 11, 2019, attached Certificate of Correction.

[21] *See* Ex. 14, Infinity Treasure Management Unanimous Consent at 1. Mr. Podhaskie's other roles have included, among others, serving as Kwok's personal attorney, general counsel to Golden Spring, and corporate representative for purposes of Rule 30(b)(6) with respect to Genever US and Genever BVI.  *See, e.g.*, Ex. 4, Tr. of Telephonic 341 Meeting of Creditors, dated April 6, 2022 at 79:2-3 (Kwok stating that Podhaskie "used to be Golden Spring attorney and my personal attorney."); Ex. 18, Podhaskie Dep. Tr. at 8:8-9:1 (Podhaskie appearing as corporate representative of Genever US and Genever BVI).

[22] *See, e.g.*, Ex. 19, Application for Authority of Lamp Capital LLC, dated Sept. 11, 2020, at 4, filed with the State of New York (signed by Podhaskie).

(4)    Lamp Capital purportedly "loaned" Kwok $1 million, which was then remitted directly to Brown Rudnick LLP ("<u>Brown Rudnick</u>"), Kwok's former bankruptcy counsel, as a retainer.[24]

c)    **Greenwich Land LLC ("<u>Greenwich Land</u>").**  Greenwich Land, a Delaware entity purportedly owned by Kwok's wife, owns Kwok's residence on Taconic Road (the "<u>Taconic Road Residence</u>") in Greenwich, Connecticut.

(1)    Greenwich Land was organized in 2019 by a partner at the law firm of Hodgson Russ, which at the time represented Kwok in the State Court Action.[25]

(2)    On or about April 26, 2022, in a transfer that was never disclosed to this Court (and despite the restraining notice PAX had served on Greenwich Land in May 2021[26]), Greenwich Land sold a second property, on Ferncliff Road in Cos Cob, Connecticut, which it had previously owned.[27] The authorized signatory for Greenwich Land on the warranty deed in connection with the transfer is Max Krasner, who, as noted above, is an associate of Kwok with a number of roles at Kwok-affiliated entities.[28]

---

[23] *Id.* (attached Application for Authority filed by Courtney L. Scanlon of Hodgson Russ LLP).

[24] *See* Application of the Debtor for Entry of an Order Authorizing the Employment and Retention of Brown Rudnick LLP as Counsel for the Debtor, Docket No. 86, at ¶ 17; Ex. 4, Tr. of Telephonic 341 Meeting of Creditors, dated April 6, 2022 at 49: 22-24. At his April 6, 2022 Section 341 meeting, Kwok testified that this loan was not in writing and that he did not know the terms of the loan, why the money had been lent, or what the source of the money was. *Id.* at 49-51.

[25] Hodgson Russ attorneys also assisted Kwok with, among other things, the formations of Saraca and Lamp Capital, as well as other corporate filings on behalf of Golden Spring. *See* Ex. 20, Saraca Media Group Inc. Certificate of Incorporation, dated May 31, 2018 (signed by Courtney Scanlon); Ex. 21, Certificate of Incorporation of Lamp Capital LLC, dated September 4, 2020 (signed by Valerie E. Stevens); Ex. 22, Biennial Statement of Golden Spring, filed October 16, 2018 (signed by Courtney Scanlon).

[26] Ex. 103, Restraining Notice.

[27] Ex. 15, Greenwich Land Warranty Deed, dated April 26, 2022.

[28] *Id. See* FN 23. At Kwok's first 341 meeting, counsel for the United States Trustee, Holley Claiborne, asked Kwok twice who Mr. Krasner was, and Kwok first said he did not know, then failed to respond. Ex. 23, Tr. of Telephonic 341 Meeting of Creditors, dated March 21, 2022 at 51:7-12. When Ms. Claiborne asked Kwok to answer the question, Kwok's counsel Mr. Baldiga conferred with Kwok despite Ms. Claiborne stating that she "would rather he would answer the question before you make a confer." *Id.* at 13:18. Kwok then said he had difficulty with English names and that he did know a "Max" at Golden Spring though not his last name. *Id.* at 51-52.

(3)    Greenwich Land's address at 162 East 64th Street, New York, New York 10065 has been used as the address of Kwok and numerous affiliated entities, including Golden Spring and HK USA.[29]

d)    **HK International Funds Investments (USA) Limited, LLC ("<u>HK USA</u>").**  HK USA is an entity, purportedly owned by Kwok's daughter, Mei Guo, that holds title to Kwok's 150-foot yacht, the Lady May, thus allowing Kwok to enjoy the yacht while claiming not to own it.

(1)    In the State Court Action, the State Court made findings that, among other things, the Lady May was beneficially owned and controlled by Kwok.

(2)    In Adversary Proceeding 22-05003 (the "HK USA Adversary Proceeding"), HK USA has asserted, despite the State Court's findings in the State Court Action (preclusive as to HK USA), that the Lady May is not property of the estate because it is owned by HK USA.

(3)    The Trustee's answer and counterclaims filed in the HK USA Adversary Proceeding assert, among other things, that HK USA is the alter ego of Kwok and that the Lady May was received by HK USA pursuant to an actual fraudulent transfer effectuated by Kwok to protect the Lady May from creditors.

(4)    HK USA's expenses (including its legal fees) have been paid for by Golden Spring and Lamp Capital, entities that, as noted above, are purportedly owned by Kwok's Son and that also pay for Kwok's attorneys' fees and living expenses.

(5)    HK USA has no income, bank account, directors, officers, or employees.  HK USA has also shared an address with Kwok and other Kwok-linked entities.  Kwok and HK USA currently are represented by the same counsel, and, even when Kwok was represented by separate chapter 11 counsel (Brown Rudnick), the attorneys representing Kwok, HK USA, and Golden Spring operated as essentially one legal team.[30]

---

[29] *See, e.g.*, Initial Petition (defined below); Ex. 9, Limited Liability Company Agreement of HK International Funds Investments (USA) Limited, LLC, dated April 1, 2019, at 3(a).

[30] *See, e.g.*, Ex. 24, email from Stephen Kindseth to Russell Stockil, CCing Max Krasner and Aaron Mitchell, dated April 9, 2022; Ex. 25, Email from Stephen Kindseth to Craig Jalbert, CCing Melissa Francis, dated April 17, 2022.

e)    **Eastern Profit Corporation ("Eastern").**  Eastern is a Hong Kong entity, purportedly owned by Kwok's daughter,[31] that Judge Liman of the U.S. District Court of the Southern District of New York, in his 2021 decision in the case of *Eastern Profit Corp. v. Strategic Vision US LLC* (the "Liman Decision"), found to be, "in essence, a shell corporation" for Kwok[32] allegedly used to "protect his confidentiality and anonymity."[33]

    (1)    The subject of the Liman Decision was a January 2018 agreement, purportedly between Eastern and Strategic Vision US LLC (the "Strategic Vision Agreement"), that was signed on behalf of Eastern by Yvette Wang (president of Golden Spring).  But Ms. Wang did not sign her own name, instead she forged the signature of another associate of Kwok's, Han Chunguang[34] (upon information and belief, Kwok's driver, bodyguard, and cook),[35] who had purportedly owned Eastern prior to transferring purported ownership of Eastern to Kwok's daughter for no apparent consideration in 2017.[36]

    (2)    Judge Liman observed that, at the time Eastern entered into the Strategic Vision Agreement, Eastern was "essentially a defunct entity" with "no assets other than . . . $80,000 frozen in a Hong Kong bank account," and "no operations and no employees." [37]  Further, analogously to HK USA and other shell companies, Eastern's location "was in the

---

[31] *Eastern Profit Corp. Ltd. v. Strategic Vision US LLC*, No. 18-CV-2185 (LJL), 2021 WL 2554631 at *4 (Kwok's daughter "is now the owner and sole director of Eastern.").

[32] *Id.* at *3.

[33] *Id.* at *23-24 ("During negotiations, [Kwok] requested that, to protect his confidentiality and anonymity, he would not sign or be a party to the Agreement but that a separate entity would sign and be a party.").

[34] Upon information and belief, Han Chunguang's name is also spelled "Han Changuang."

[35] Han Chunguang's name was spelled (incorrectly, upon information and belief) "Han Changhui" in Judge Liman's published decision.  Han Chunguang is listed on the Hong Kong Restraint Order as an individual whose bank accounts were subject to Kwok's control. *See* Ex. 3, Hong Kong Restraint Order ¶ 3, Respondent 25.

[36] Liman Decision at *25 ("Although . . . Han was the ostensible owner of Eastern, it has now been transferred to [Kwok's daughter] but Han could not testify that he received anything in exchange. Eastern is a shell for [Kwok] and his family.") (internal citations omitted).  *Id.* at *4 ("Prior to 2017, the owner and sole director of Eastern was an individual named Han [Chunguang] ('Han'). In 2017, Han transferred ownership and control to [Kwok's daughter] who was a friend of Han's and who is now the owner and sole director of Eastern.").

[37] *Id.* at *25.

offices of [Kwok's] family company in Hong Kong and its sole director was [Kwok's] daughter."[38]

(3) Judge Liman also found that testimony from Ms. Wang and Mr. Han with respect to Mr. Han's role in connection with the Strategic Agreement was "an after-the-fact creation to make it appear that Eastern was an entity, separate from [Kwok]."[39]

(4) Judge Liman inferred, with respect to the Strategic Agreement, that "[Kwok] told Wang to provide the name Eastern to Strategic and to sign Han's name to the Agreement.  If there was any conversation between Wang and Han, it was perfunctory, to confirm the arrangement that *[Kwok] had already made and directed*."[40]

(5) According to testimony elicited at the hearing held in connection with the Liman Decision, Kwok introduced Mr. Han (the purported owner of Eastern) as his cook, referring to him as "Little Han,"[41] and introduced Ms. Wang as his servant and assistant.[42]  There was also testimony that Ms. Wang described Kwok as her "boss."[43]

---

[38] *Id.* at *25-26.

[39] *Id.* at *24-25.

[40] *Id.* (emphasis added).

[41] Ex. 26, Trial Tr. at 768:4-12, *Eastern Profit Corp. Ltd. v. Strategic Vision US LLC*, No. 18-CV-2185 (LJL) (S.D.N.Y) ECF No. 368 (April 22, 2021).

[42] Ex. 27, Trial Tr. at 142:12-19, *Eastern Profit Corp. Ltd. v. Strategic Vision US LLC*, No. 18-CV-2185 (LJL) (S.D.N.Y) ECF No. 362 (April 19, 2021) ("Q. Did he introduce [Ms. Wang] in any way -- let me ask you this. What did he introduce her as? A. Well, originally as his assistant. Q. Did he say anything else about what she did for him? A. He said that she did, you know, what personal assistants do and -- but he sent her from the room."). Ex. 28, Trial Tr. at 248-249, *Eastern Profit Corp. Ltd. v. Strategic Vision US LLC*, No. 18-CV-2185 (LJL) (S.D.N.Y) ECF No. 362 (April, 19, 2021) ("Q. Did [Kwok] come to introduce [Ms. Wang] at a particular meeting at some point? A. At the first meeting, he just referred to her as like a servant. In the second meeting, he introduced her as his assistant.").

[43] Ex. 27, Trial Tr. 142-143 ("Okay. Now, I'm going to ask you what Yvette Wang told you about her role. So what did Yvette Wang tell you was her role with respect to this contract?  A. Well, first of all, she said: [Kwok] is my boss. I am project manager, and I will be handling this project moving forward."); *id.* ("Did she have any name for [Kwok] or any term she used to describe him?  Yes. She called him chief. She gave him some military ranks. She called him the boss.").

11

(6)    The Hong Kong Restraint Order identified Eastern as the purported holder of a bank account that was "subject to the effective control" of Kwok.[44]

f)    **Saraca Media Group, Inc. ("Saraca")**.  Saraca is a Delaware entity, purportedly owned by Kwok's Son,[45] that Kwok has used to engage in, among other things, the sale of purported cryptocurrencies.

(1)    Saraca shares the same address as Golden Spring,[46] and Golden Spring's president, Ms. Wang, is an authorized signatory on Saraca official documents.[47]

(2)    Saraca is the registered owner with the United States Patent and Trademarks Office of the marks "Miles Kwok," "Miles Guo," and "Guo Wengui."[48]

(3)    In September 2021, the Securities and Exchange Commission ("SEC") issued a cease and desist order ordering that Saraca and its subsidiary GTV Media Group, Inc. ("GTV") cease violations of the securities laws in connection with purported sales of GTV stock and G-Coin and G-Dollar cryptocurrencies, which had "raised approximately $487 million from more than 5,000 individuals."[49]  The Office of the Attorney General of the State of New York took similar action against Saraca and GTV.[50]

---

[44] Ex. 3, Hong Kong Restraint Order ¶ 3, Respondent 16.

[45]  Ex. 4, Tr. of Telephonic 341 Meeting of Creditors, dated April 6, 2022 at 108:12-13 ("Q: Who owns Saraca? A: My son.").

[46]  *See* Ex. 11, Saraca Media Group Inc. OpenGovNY New York State corporate registry search results.

[47] *See, e.g.*, Ex. 29, Himalaya Coin Certificate of Assumed Name, dated March 14, 2020, and Ex. 30, Himalaya Dollar Certificate of Assumed Name, dated March 14, 2020.

[48] Ex. 31, United States Patent and Trademark Office Registry Pages for Miles Guo, Miles Kwok, Guo Wengui, and Guo Media.

[49] *See In the Matter of Gtv Media Group, Inc., Saraca Media Group, Inc., and Voice of Guo Media, Inc., Respondents*, Release No. 10979, 2021 WL 4149064, at ¶ 1, 5 (Sept. 13, 2021) (finding that companies that GTV, Saraca, and Voice of Guo Media, Inc. violated the Securities Act in connection with "solicit[ing] thousands of individuals to invest in an offering of GTV common stock" and "solicit[ing] individuals to invest in their offering of a digital asset security that was referred to as either G-Coins or G-Dollars," thus allowing these companies to "collectively raise[] approximately $487 million from more than 5,000 investors, including individuals in the United States, through approximately July 2020").

[50] Ex. 32, Assurance of Discontinuance, Assurance No. 21-062, *In the Matter of Investigation by Letitia James, Attorney General of the State of New York*, *of GTV Media Group, Inc., and Saraca Media Group, Inc*.

      (4)     Saraca is also involved in Kwok's more recent cryptocurrency scheme of promoting and selling "Himalaya Coin" and "Himalaya Dollar" (also known as "H-Coin" or "H-Dollar").

      (5)     Saraca registered "Himalaya Coin" and "Himalaya Dollar" as its assumed names in the State of New York, using filings signed by Ms. Wang, ***president of Golden Spring.***[51]

      (6)     As of 2019, Saraca's president and director was reportedly Han Chunguang, the same individual alleged to be Kwok's driver, bodyguard, and cook who transferred Eastern Profit Corporation to Kwok's daughter for no apparent consideration in 2017.[52]

g)    **Ace Decade Holdings Limited ("<u>Ace Decade</u>").**  Ace Decade is a BVI entity Kwok acquired to use as an intermediary entity in connection with the failed 2015 securities transaction that generated Kwok's lawsuits against UBS.  Kwok used Ace Decade to avoid disclosure requirements that would have arisen had Kwok purchased the securities directly.[53]

      (1)     Kwok acquired Ace Decade in November 10, 2014 and on the same day appointed one of his employees, Yu Yong ("<u>Ms. Yu</u>") as the sole director and nominee shareholder.[54]

      (2)     Kwok allegedly appointed Ms. Yu to these roles based on the alleged advice of his banker at UBS, who suggested the use of an intermediary entity to avoid disclosure requirements.[55]

---

[51] *See* Ex. 29, Himalaya Coin Certificate of Assumed Name; Ex. 30, Himalaya Dollar Certificate of Assumed Name.

[52] Swan, Jonathan, et al. "Exclusive: Steve Bannon's $1 million deal linked to a Chinese Billionaire," AXIOS, 29 Oct. 2019, https://www.axios.com/2019/10/29/steve-bannon-contract-chinese-billionaire-guo-media ("Guo Media is owned by Saraca Media Group, a company incorporated in Delaware, according to the contracts. Per a March 2019 tax filing, the president and director of Saraca was an individual named Han Chunguang.").

[53] Ex. 2, Affidavit of Kwok Ho Wan at ¶¶ 13-14 ("UBS advised that . . . if I invested through Ace Decade directly, applicable disclosure requirements would require certain filings [and] advised that if I invested through an intermediary entity, with the intermediary entity holding legal title to the Shares, no such disclosure would be required.").

[54] Ex. 33, Particular of Claims, *Kwok Ho Wan & Ors. v. UBS*, Cl-2020-000345, ¶ 24, High Court of Justice of England and Wales Queen's Bench Division Commercial Court, dated September 23, 2020 ("<u>UK Complaint</u>").

[55] *Id.* at ¶ 24 ("Ace Decade was acquired on 10 November 2014 by Mr Kwok for the purpose of acting as the said investment vehicle. On the same day, on the advice of Mr Wong, an employee of Mr Kwok, Ms Yu Yong ("<u>Ms Yu</u>") became its nominee shareholder and director.").

(3)     The Hong Kong Restraint Order identified Ace Decade as the purported holder of a bank account that was "subject to the effective control" of Kwok.[56]

(4)     Kwok stated he owned Ace Decade in his signed complaint filed in the United Kingdom against UBS and at his section 341 meeting of creditors held on April 6, 2022, only to subsequently reverse course at the September 30, 2022 hearing and dispute, through his counsel, his ownership of Ace Decade, claiming (incredibly) that each of his admissions was the result of a translation error. Kwok then changed his position on this question again, conceding on November 17, 2022 that he "exclusively beneficially owned and controlled [Ace Decade] on the February 15, 2022 petition date [] and maintained such exclusive beneficial ownership and control up to and including immediately prior to the date of the Trustee's appointment."[57]

h)     **Well Origin Limited ("Well Origin").**  Well Origin is a BVI entity owned by Kwok that was formed as a "special purpose vehicle" to own a private jet, an Airbus 319 (the "Aircraft").[58]

(1)     In 2014, Well Origin entered into a $50 million loan agreement with UBS AG ("UBS") to "refinance the Aircraft purchase price" as well as a related aircraft mortgage agreement.[59]  In addition, Kwok entered into a related guarantee agreement with UBS.  UBS was also granted a security interest in Well Origin's shares.[60]

(2)     Subsequently, UBS foreclosed on its security interest in the shares of Well Origin, took control of Well Origin, and notified Kwok that it was going to sell the Aircraft.[61]

---

[56] Ex. 3, Hong Kong Restraint Order ¶ 3, Respondent 18.

[57] Order Regarding Partial Resolution of Trustee's Contempt Motion, Docket No. 1110, at ¶ 1.

[58] Ex. 34, Petition at ¶ 7, *Kwok How Wan v. UBS AG, et al.*, Index No. 152025/2019 (N.Y. Sup. Ct.) Doc. No. 1. The capacity of a normal airline A319 is approximately 150 passengers.

[59] *Id.* ¶¶14-16.

[60] *Id.* ¶ 15.

[61] *Id.* ¶¶ 22-24.

(3)     In an action filed in February of 2019, Kwok sought to enjoin the sale, asserting that he was the "***Aircraft's true beneficial owner***,"[62] and that the Aircraft was "unique," "personal," and "specific to him.[63]  The court rejected Kwok's request for an injunction, pointing out that Kwok was asserting rights under an aircraft mortgage agreement that he had not signed.[64]

(4)     With respect to Well Origin, Kwok looked past the corporate form and asserted he was the true beneficial owner of the Aircraft because it suited him to do so (given that UBS had taken control of Well Origin).

i)     **Numerous Other Shell Companies**:  It is likely that the entities discussed in this Complaint comprise only a small number of what are reportedly hundreds of shell companies controlled by Kwok.[65]  The reported existence of such a large number of shell companies is supported by the fact that in the Hong Kong Restraint Order Kwok was determined to effectively control financial accounts purportedly held by over two dozen entities and individuals, including certain of the entities already mentioned herein, including Bravo Luck and Ace Decade.[66]

---

[62] Ex. 35, Memorandum Of Law In Support Of His Request For A Temporary Restraining Order And Preliminary Injunction at 2, *Kwok v. USB AG et al*, Index No. 152025/2019 (N.Y. Sup. Ct.), NYSCEF Doc. No. 15 (February 25, 2019) ("Moreover, ***the Aircraft's true beneficial owner – Kwok*** – has been an outspoken critic of the Chinese government and Chinese Communist Party ("CCP") and Kwok has personally exposed massive corruption within the CCP that has resulted in the Chinese government and CCP stopping at no expense to seize any property and asset either directly or indirectly related to Kwok."). *See also id.* at 1 ("UBS, in blatant contravention of the terms of the mortgage, is wrongfully trying to sell the Aircraft without properly notifying ***Kwok -- the Aircraft's beneficial owner***, and guarantor on a loan related to the Aircraft -- of the potential sale.').

[63] *Id.* at 2 ("Kwok will suffer irreparable harm if the preliminary injunction is not granted to stay the sale of the aircraft as ***the Aircraft is unique to Kwok*** – he personally worked with the designer on the outfitting of the Aircraft and was comprehensively involved in the Aircraft's particular design and specification"); *Id.* at 6-7 ("If UBS is permitted to move forward with the sale despite their defective notice and without providing Kwok an accounting, Kwok will permanently lose the Aircraft that ***is personal and specific to him***, for which money damages cannot and will not suffice.").

[64] Ex. 36, Order at 3, *Kwok v. USB AG et al*, Index No. 152025/2019 (N.Y. Sup. Ct.), NYSCEF Doc. No. 17 (February 26, 2019) ("Petitioner's sole contractual connection to the aircraft is vis-à-vis a written guarantee of the non-party mortgagor's obligations which are collateralized via the aircraft.").

[65] Escobar, Pepe, et al. "Exclusive: The Fugitive Who Tried to Spark a US-China War." Zero Hedge, Aug. 10, 2022, https://www.zerohedge.com/geopolitical/escobar-fugitive-who-tried-spark-us-china-war ("[Kwok] set up more than 100 companies in Hong Kong, China, the United Kingdom, the United States, the British Virgin Islands, and the Cayman Islands.").

[66] Ex. 3, Hong Kong Restraint Order ¶ 3.

11.     In sum, while this Complaint focuses on Bravo Luck, and the Plaintiff does not herein seek relief against other entities, the context regarding Kwok's wide-ranging strategy of using shell companies to shelter assets from creditors will assist the Court in understanding the allegations in this Complaint.[67]  Of course, the Plaintiff also expressly reserves its rights to pursue actions asserting claims against each of those other entities at the appropriate time.

**B.     Purchase of Sherry Netherland Apartment**

**i.     Kwok Submits Purchase Application**

12.     On February 26, 2015, Kwok submitted a purchase application (the "Purchase Application") for the Sherry Netherland Apartment, listing the "applicant" as "'Miles' Kwok Ho Wan (Genever Holdings LLC)."[68]  The Purchase Application did not reference Bravo Luck or the Purported Trust Agreement, even though the Purported Trust Agreement had allegedly been executed by that time.

13.     The Purchase Application (and sale contract submitted together therewith) stated that closing could occur by no later than 10:00 a.m. on March 6, 2022.[69]

14.     In connection with the Purchase Application, Kwok and/or others on his behalf submitted several other documents to the Sherry Netherland, Inc. (the "Sherry Netherland"), including:

> a)     A financial letter of reference, dated February 23, 2015, from Tommy Cheung and Stephen Wong, Managing Directors at the UBS AG Hong Kong Branch ("UBS Letter").  The UBS Letter stated that Kwok "has

---

[67] The Plaintiff reserves all its rights in connection with potential future alter ego, veil piercing, or substantive consolidation claims against Bravo Luck.

[68] *See* Ex. 37, Sherry Netherland Purchase Application Materials, at SN 0047.

[69] Ex. 38, Email from Susan Hennelly attaching Contract of Sale, dated March 3, 2015, at SN 0029.  *See also* Ex. 39, Minutes of meeting of the Board of Directors of the Sherry Netherland held on March 3, 2015, at 2 ("The contracts' closing date is set for not later than March 6, 2015 and provide that the purchaser may terminate the contracts if there is no closing by that date.").

been a client of ours through a personal investment company since July 2012 and during this time [Kwok] has had a satisfactory banking relationship with us.  At 18 Feb. 2015, the funds involved in this banking relationship is not less than USD $400,000,000."[70]  Upon information and belief, the "personal investment company" of Kwok referenced in this letter is Bravo Luck.

b)    A letter dated February 25, 2015, from Jerry L. Shulman, an attorney at the law firm of Williams & Connolly LLP, which then represented Kwok (the "<u>Shulman Letter</u>"), and not, upon information and belief, Bravo Luck. Among other things, the Shulman Letter attached the 2013 financial statements for a company called Beijing Zenith Holdings Co., Ltd. ("<u>Beijing Zenith</u>") and promised that the Sherry Netherland would soon be provided with Beijing Zenith's unaudited 2014 financials and a "certification that (a) Mr. Kwok is the owner and controlling person of the company and (b) the company continues in existence and operation."[71]

c)    A follow-up letter to the Shulman Letter, dated February 27, 2015, from Ira J. Gilbert (the "<u>Gilbert Letter</u>"), an attorney at the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("<u>Paul Weiss</u>"), then acting as "local real estate counsel for Mr. Kwok Ho Wan, an applicant to become a shareholder/tenant at the Sherry Netherland,"[72] and not, upon information and belief, acting as counsel to Bravo Luck.  The Gilbert Letter included as attachments the unaudited 2014 financial statements of Beijing Zenith as well as a document titled "Beijing Zenith Holdings Co., Ltd Declaration of Ownership," which stated that Kwok "actually owns and controls the company."[73]

d)    Letters of reference, with respect to Kwok individually, submitted by Tony Blair (the former British prime minister), Hank Lo (a Hong Kong attorney and partner at Stevenson, Wong Co.), and Stephen Wong, of UBS.[74]  Mr. Lo's letter stated that "my firm has acted for Miles [i.e., Kwok] in various business transactions, including project financing, fund-raising, corporate mergers and acquisitions and acquisition of aircrafts,

---

[70] Ex. 40, Letter from UBS AG HK, dated Feb 23, 2015, *In re Genever Holdings LLC*, Case No. 20-12411-jlg (Bankr. S.D.N.Y.), ECF No. 14-64 ("the funds involved in this banking relationship is not less than USD400, 000,000").

[71] Ex. 41, Letter from Jerry L. Shulman, dated February 25, 2015, at 1.

[72] Ex. 42, Letter from Ira J. Gilbert, dated February 27, 2015, at 1.

[73] *Id.* at 2.

[74] Ex. 38, Email from Susan Hennelly at SN 0050-54 (attaching letters of reference from Tony Blair (the former British prime minister), dated February 2015, Hank Lo (a Hong Kong attorney and partner at Stevenson, Wong Co.), dated February 17, 2015, and Stephen Wong (of UBS) dated February 18, 2015).

leisure boats and properties in Hong Kong, China and different parts of the
world" and that Kwok was "dependable and responsible."[75]  Mr. Wong's
letter stated, similarly, that Kwok worked with UBS "in the areas of
securities investment and also in financing his various projects in areas
such as aircraft acquisitions" and that Kwok "is very reliable and always
fulfills his repayment obligations."[76]

15.    At a meeting of the Board of Directors of the Sherry Netherland held on March 3,

2015, the Board of Directors determined that "the financial information provided by Mr. Kwok

was not sufficient for the Board to consider the application and that . . . additional due diligence

is required by the Board, including but not limited to obtaining additional financial information

regarding Mr. Kwok."[77]

### ii.    Kwok Represents Bravo Luck's Assets Are His Own

16.    In response to the Sherry Netherland's request for additional financial

information, Kwok's counsel in Hong Kong, Stevenson, Wong & Co., submitted a letter to the

Sherry-Netherland, dated March 4, 2015, in support of Kwok's purchase application (the

"Stevenson Wong Letter").

17.    The Stevenson Wong Letter stated, among other things, that Bravo Luck was

"legally and beneficially owned as to 50% by [Kwok] and 50% by [Kwok's Son] respectively"

and that the bank account of Bravo Luck at UBS AG ("UBS") with account number 371236 (the

"Bravo Luck UBS Account") "is operated by either [Kwok] or [Kwok's Son] signing solely and .

. . is able to be accessed by either of them signing solely."[78]  In other words, regardless of who as

a technical legal matter owned Bravo Luck, Kwok had complete access to the Bravo Luck UBS

---

[75] *Id.* at SN 0053.

[76] *Id.* at SN 0054.

[77] Ex. 39, Minutes of meeting of the Board of Directors of the Sherry Netherland, at 2.

[78] Ex. 43, Stevenson Wong Letter, dated March 5, 2015, at 2.

Account.

18.    The Stevenson Wong Letter included as an attachment a special report from UBS dated March 3, 2015 demonstrating that the Bravo Luck UBS Account held liquid assets with a value of approximately $490 million.

19.    Upon information and belief, the Stevenson Wong Letter post-dates the payment by Bravo Luck of approximately $30 million to purchase the Lady May yacht on February 23, 2015, meaning that immediately prior to February 23, 2015, the Bravo Luck UBS Account held approximately $520 million (the $490 million in the account on March 3, 2015 plus the $30 million used to purchase the Lady May on February 23, 2015).

20.    The Hong Kong Restraint Order identified the Bravo Luck UBS Account as a bank account that, while purportedly held by Bravo Luck, was "subject to the effective control" of Kwok and Kwok's Son.[79]  The Hong Kong Restraint Order was issued in 2018, indicating that Kwok's access to the Bravo Luck UBS Account continued well after his purported transfer of his equity interest in Bravo Luck to Kwok's Son in May 2015 (discussed further below).

### iii.    Submission of Bravo Luck Financial Information Persuades Sherry Netherland to Approve Kwok's Purchase Application

21.    At the meeting of the board of directors of the Sherry Netherland held on March 4, 2022, the Chairman of the meeting, Michael J Horvitz, reported, according to the minutes of the meeting:

> that since yesterday's meeting, [Horvitz] was in receipt from counsel for Genever Holdings LLC, the prospective purchaser of the 18th Floor and Maid's Rooms 719 and 2219, of a bank statement from UBS showing that the principal owner of the purchaser Miles Guo, also known as, Kwok Ho Wan, also known as Miles Kwok, had a bank account with UBS which contained liquid assets in an amount sufficient to give Mr. Horvitz comfort that Mr. Kwok met the Board's financial standards, together with an opinion of Stevenson, [Wong] & Co., a legal firm in

---

[79] Ex. 3, Hong Kong Restraint Order ¶ 3, Respondent 21.

Hong Kong indicating that access to the account was available to either Mr. Kwok Ho Wan or one other person. Based upon these documents, Mr. Horvitz said that he was satisfied that the purchaser had adequate financial resources to become a shareholder of the Corporation assuming the Board's previously discussed requirement that he place a security deposit with the Corporation equal to five years' annual maintenance for the three units being acquired.[80]

22.     According to the testimony of Michael Ullman, Executive Vice President and Chief Operating Officer of the Sherry Netherland, "[a]ll of the financial information that [Kwok] presented to The Sherry-Netherland was financial information of companies that he purported to own."[81]

### iv.    Purchase of Sherry Netherland Apartment

23.     On or around March 4, 2015, no less than approximately $63 million of the funds used to purchase the Sherry Netherland Apartment were transferred from the Bravo Luck UBS Account to a representative of the seller.[82]  Upon information and belief, this payment was processed pursuant to a wire transfer form signed by Kwok.[83]

24.     Upon information and belief, any cash held by Bravo Luck, including the cash used to purchase the Sherry Netherland Apartment, was provided to Bravo Luck by Kwok or an entity controlled by Kwok.

25.     At the time Bravo Luck paid for the Sherry Netherland Apartment, Kwok formally held 50% of its shares.

---

[80] Ex. 44, Minutes of meeting of the Board of Directors of the Sherry Netherland held on March 4, 2015, at 1.

[81] Ex. 45, Ullman Dep. Tr. at 60:5-9 ("Q: All of the financial information that [Kwok] presented to The Sherry-Netherland was financial information of companies that he purported to own? A: Yes").

[82] Ex. 46. BVI Affidavit of Qiang Guo, at ¶ 49, dated December 29, 2021.

[83] Escobar, Pepe, et al. "Exclusive: The Fugitive Who Tried to Spark a US-China War." Zero Hedge, Aug. 10, 2022, https://www.zerohedge.com/geopolitical/escobar-fugitive-who-tried-spark-us-china-war.

26.     According to a purported Instrument of Transfer, on May 26, 2015, Kwok transferred his 50% interest in Bravo Luck to Kwok's Son in exchange for consideration of one dollar.[84]

27.     The sale of the Sherry Netherland Apartment, for a price of $70 million, closed on March 6, 2015.  Documents executed in connection with the closing included a Proprietary Lease (the "Lease") with the Sherry Netherland as Lessor and Genever US as Lessee, as well as an Agreement and Consent with Respect to Shares and Proprietary Lease (the "Agreement and Consent") with the Sherry Netherland as Lessor, Genever US as Lessee, and Kwok as Occupant. Under the Agreement and Consent, Kwok represented that Genever BVI was sole member of Genever US and agreed to, among other things, be bound by all the obligations of Genever US under the Lease and to deliver a personal guaranty guaranteeing the performance of Genever US thereunder.[85]  Such personal guarantee was executed by Kwok on March 6, 2015 and attached as an exhibit to the Agreement and Consent.[86]

**v.     Counsel Opine on Genever US and Genever BVI's Capacity to Contract and Perform Obligations**

28.     In addition, on March 6, 2015, Kwok's counsel submitted certain additional documents to the Sherry Netherland, including:

a)     A letter from Paul Weiss, describing itself as "special counsel to [Genever US]," opining, based on the review of enumerated Genever US corporate documents and related materials, that, among other things:

---

[84] Ex. 47, Instrument of Transfer, dated May 12, 2015, *See* also Ex. 46, BVI Affidavit of Qiang Guo at ¶ 31 ("The legal ownership of Bravo Luck was changed for a limited period of approximately four months between 26 January 2015 and 12 May 2015, whereby I transferred 50% legal ownership of Bravo Luck to [Kwok]").

[85] Ex. 48, Agreement and Consent, dated March 6, 2015, at ¶ 3-5.

[86] *Id.* at SN 0298-0300.

(1)     Genever US had "all the necessary power to execute and deliver" the leases and related transactional documents executed in connection with the sale of the Sherry Netherland Apartment (the "Transactional Documents");

(2)     Genever US had "all necessary power to execute, deliver and perform its obligations under the Transactional Documents"; and

(3)     Each Transactional Document constituted "the legal, valid, and binding obligation of [Genever US], enforceable against [Genever US] in accordance with its terms."[87]

b)     A letter from Ogier, BVI counsel to Kwok and/or Genever BVI, based on the review of enumerated Genever BVI corporate documents and related materials stating, among other things, that Genever BVI "has the capacity and power to form and hold membership interests in [Genever US], to be [Genever US's] sole member and, as a matter of British Virgin Islands law, to cause [Genever US] to enter into" the Transactional Documents.[88]

29.     Notably, Paul Weiss and Ogier, in preparing these opinion letters, purported to review the key corporate documents, enumerated in their letters, regarding Genever US and Genever BVI, respectively.  Tellingly, despite its purported date of February 17, 2015—that is, before the opinion review period—the Purported Trust Agreement was not among these documents.  Upon information and belief, this was because the Purported Trust Agreement did not exist at that time.

30.     In fact, at no point during the process of purchasing the Sherry Netherland Apartment did Kwok or anyone else make any reference to the Purported Trust Agreement. Upon information and belief, this was because the Purported Trust Agreement did not exist at that time.

---

[87] Ex. 49, Letter from Paul, Weiss, Rifkind, Warton & Garrison LLP, dated March 6, 2015, at 2.

[88] Ex. 50, Letter from Ogier, dated March 6, 2015, at 3.

31.      Upon information and belief, Kwok, and not Kwok's Son, used the Sherry
Netherland Apartment as his principal residence from 2015 until shortly prior to the filing of this
Complaint.

      C.      **Kwok's Intent to Transfer Sherry Netherland Apartment to Son**

          i.      **Kwok's Representatives Inquire Regarding Transfer of Sherry
              Netherland Apartment to Son Through Trust Arrangement**

32.      According to the testimony of Mr. Ullman of the Sherry Netherland, in or around
June of 2016, Kwok's real estate agent, Kathy Sloane, met with Mr. Ullman in his office and
inquired regarding how Kwok could transfer ownership of the Sherry Netherland Apartment to
Kwok's Son.[89]  Mr. Ullman responded by explaining that such a transfer would require "go[ing]
through the entire process of purchase again and he would have to submit letters of
recommendation, updated financials and the whole package that's required to transfer it."[90]

33.      On June 29, 2022, Mr. Ullman received an email from "Yong," one of Kwok's
employees,[91] from the email address "kwokoffice.nyc@gmail.com."  In the email, Yong
introduced "our lawyer Helen Manis which I copied in the email to you," noting that
communicating with Ms. Manis "may be helpful to process the transfer [to Kwok's Son]" and
requesting "help to reply to her questions that we can process smoothly."[92]

34.      On the same day, Mr. Ullman received an email from attorney Manis in which
Ms. Manis stated that the Sherry Netherland Apartment "is currently owned by an LLC that is

---

[89] Ex. 45, Ullman Dep. Tr. at 77:16-23.

[90] *Id.* at 78:18-21.

[91] Upon information and belief, this was Yu Yong, discussed above in relation to the Ace Decade entity.

[92] Ex. 51, Email from Yong, dated June 29, 2016, at SN 0023.

*ultimately beneficially owned by Mr Kwok*."[93]  Ms. Manis then stated that "we want to undertake some restructuring in relation to the property so that the ultimate beneficial ownership will pass to [Kwok's] son," asking "*if the final result of the restructuring is that the LLC is owned by a trust of which the son is beneficiary, is this acceptable to you?*"[94]

35.    Mr. Ullman responded to Ms. Manis' inquiry on July 7, 2016, explaining that "[i]n order for the Board to consider the requested series of transfers of the apartment to a trust for the benefit of Mr Kwok's son, the Board would have to initially be provided with the items detailed on the attached Board requirements list and the completed attached transfer application."[95]

36.    Upon information and belief, Kwok's representatives suggested in these June 2016 communications that the Sherry Netherland Apartment be placed in trust for the benefit of Kwok's Son because the Purported Trust Agreement—which Kwok now alleges had *already* placed the apartment in trust for the benefit of Kwok's Son as of February 2015—did not in fact exist at that time.

### ii.    Kwok Again Attempts to Transfer Sherry Netherland Apartment to Son

37.    On June 12, 2017, an individual identifying herself as Yvette Wong[96] stated, in an email to Mr. Ullman regarding a variety of property maintenance issues: "I was told that our contact person to [the] Sherry [Netherland] is my Principle himself [i.e., Kwok], again for the

---

[93] *Id.* at SN 0018 (emphasis added).

[94]  *Id.* at SN 0019 (emphasis added).

[95] Ex. 52, Email from Michael Ullman, dated July 7, 2016, at 1.

[96] Upon information and belief, this Yvette Wong is the same individual as the Yvette Wang described above (whose roles include, among others, that of president of Golden Spring).

convenience of Family, could we change this person to be my Principle's son?"[97]  Yvette Wong

followed up on this request on June 19, 2017, inquiring "[i]s there any way we can change

[Kwok's Son] to be the Official contact person?"[98]

38.     Mr. Ullman testified that he believed this request "was an attempt to "circumvent

the [Sherry-Netherland's June 2016] decision . . . that he couldn't transfer the apartment to the

son."[99]

39.     Again, Kwok's attempt to transfer the Sherry Netherland Apartment to Kwok's

Son is irreconcilable with his current position that his son already beneficially owned the

apartment pursuant to the Purported Trust Agreement at that time.

**D.     Kwok Asserts Claims Against Sherry Netherland in 2016 Lawsuit**

40.     On August 5, 2016, Kwok and Genever US commenced an action against the

Sherry Netherland and related defendants by filing a verified complaint (with a verification

signed by Yvette Wong) in the United States District Court for the Southern District of New

York (the "2016 Complaint").[100]  The 2016 Complaint stated, among other things, that:

    a)    The Sherry Netherland had committed misconduct in handling certain
        building repairs—what the 2016 Complaint referred to as "an incident
        involving one of its most prestigious residents [i.e., Kwok] and one of its
        most expensive apartments [i.e., the Sherry Netherland Apartment]."[101]

    b)    Kwok was the "Sole Shareholder of [Genever US],"[102] which was "owned
        and operated by [Kwok]."[103]

---

[97] Ex. 53, Email from Yvette Wong, dated June 12, 2017, at 7.

[98] *Id.* at 1.

[99] Ex. 45, Ullman Dep. Tr. at 92:12-93:3.

[100] Ex. 10, Verified Complaint, *Genever Holdings, LLC v. Sherry-Netherland, Inc.*, 16-cv-06246 (S.D.N.Y. Aug. 5, 2016), ECF No. 1.

[101] *Id.* at ¶ 1.

[102] *Id.* at ¶ 22.

c)    The Sherry Netherland had unlawfully discriminated against Kwok based on his Chinese nationality in requiring the funding of a security deposit to cover five years of maintenance fees.[104]

41.    At no point in the 2016 Complaint did Kwok or anyone else make any reference to the Purported Trust Agreement, despite the Purported Trust Agreement allegedly having been executed on February 17, 2015.  Upon information and belief, the Purported Trust Agreement was never mentioned because it did not in fact exist at that time.

**E.**    **Additional Evidence That Bravo Luck Is Controlled by Kwok**

42.    Discovery obtained by PAX from Bravo Luck provides further evidence that Bravo Luck is controlled by Kwok.  For example:

a)    Disclosure from Bravo Luck's former BVI registered agent shows that the "client of record" was, prior to mid-2017, Stevenson Wong & Co., Kwok's long-time Hong Kong lawyers.

b)    In mid-2017, the client of record for Bravo Luck's BVI registered agent became William Je of Kingdom Rich Limited.[105]  William Je is a close associate of Kwok and Kingdom Rich Limited is a Kwok shell company purportedly owned by Kwok's Son[106] that, upon information and belief, once owned a boat called the Lady May II.

c)    The address used by William Je in his role as client of record of Bravo Luck's BVI registered agent is the same address listed as Kwok's address on Bravo Luck corporate documents.

d)    At the trial held in the *Eastern Profit Corp. Ltd.* litigation, one witness testified on April 22, 2021 that Kwok had introduced her to Mr. Je and described Mr. Je as "my money man."[107]  When Kwok testified at this

---

[103] *Id.* at ¶ 32.

[104] *Id.* at ¶ 124.

[105] Ex. 54, Email from Rexella Hodge, dated May 15, 2020, at 1 ("Until mid-2017, the client of record was Stephenson Wong & Co. Thereafter, the portfolio was managed by Mr. William Je of Kingdom Rich Limited. A copy of email requesting the change is attached.").

[106] Ex. 59, Kingdom Rich Ltd. Annual Return at 8 (listing Qiang Guo as only member).

[107] Ex. 26, Tr. at 774:24-775:1 ("Was he formally introduced to you? A. Yes. Mr. Guo introduced him to me that -- jokingly, that "He's my money man. Anything ask him about money.").

<div style="margin-left:2em">

trial, he invoked the Fifth Amendment multiple times when questioned regarding William Je.[108]

e)   William Je is the sole purported shareholder of a Hong Kong entity called ACA Capital Group Ltd. ("ACA"), an entity that appears to also be controlled by Kwok, with a number of ACA's directors and officers being well-known associates of Kwok.[109]

f)   Fiona Yu, ("Ms. Yu"), who, according to her business card was an in-house attorney at ACA Capital Group Ltd. ("ACA"), certified the due diligence ("KYC") materials supplied by Kwok's Son to Bravo Luck's BVI registered agent.  Ms. Yu also submitted an affidavit in the State Court Action as the "appointed person" for Kwok.[110]

g)   ACA was originally intended to be the lender of approximately $37 million to HK USA for placement into escrow in connection with the April 2022 stipulation requiring the escrowing of such funds as security to ensure the return of the Lady May to the United States.  ACA was replaced as HK USA's lender by Himalaya International Financial Group Ltd., an entity linked to Kwok's Himalaya Coin/Himalaya Dollar cryptocurrency operation.

h)   ACA has a history of gifting funds to Kwok under the guise of purported loans.  In the Liman Decision, Judge Liman found that ACA had given a gift of $1 million to Eastern Profit Corporation, despite the contention that these funds were provided as a loan and the existence of a document that purported to be a loan agreement.[111]  During the related litigation, Strategic Vision US LLC had suggested that Kwok was the source of the

</div>

---

[108] *See id.* 691: 24-25 ("Q. Who is William Je? A. The Fifth Amendment."); *Id.* at 692:24-693:1 (Q: "And [Mr. Je] sends money to places when you ask him to do so, doesn't he? A: The Fifth Amendment. I'm invoking the Fifth Amendment."); *id.* at 695: 5-7 ("And you introduced William Je to close associates as your money man, haven't you? A. The Fifth Amendment.").

[109] *See* Ex. 55, ACA Capital Group Limited Articles of Association, at 2 (identifying Je Kin Ming (alias of William Je) as sole shareholder); Ex. 56, ACA Capital Group Ltd. Change in Particulars of Company Secretary and Director, dated April 1, 2017, at 3 (signed by Fiona Yu); Ex. 57, ACA Capital Group Ltd. Annual Return, dated Jan. 6, 2019, at 4 (listing Karin Maistrello as director).

[110] Ex. 58, Affirmation of Fiona Yu in Support of Defendant's Motion to Dismiss ¶ 1, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 11.

[111] *Eastern Profit Corp. Ltd.*, 2021 WL 2554631, at *41 ("The source of the funds sent by ACA is unknown to the Court and was not the subject of testimony. But regardless of whether those funds are ultimately traceable to [Kwok] as Strategic suggested or are independent from him, the Court finds that they were a gift on behalf of Eastern (and [Kwok]) and not provided out of any obligation.").

funds gifted to Eastern, however Judge Liman did not make a finding on that issue.[112]

    i)      ACA Capital contributed to the payment of Kwok's legal fees in connection with the State Court Action.[113]

**F.      PAX's Litigation Against Kwok**

    **i.      PAX Claim**

43.     As determined by the State Court,[114] during the entire time period relevant to this Complaint, Kwok was personally indebted to PAX pursuant to a 2011 personal guarantee (the "2011 Personal Guarantee") with respect to amounts owing in connection with a loan made by PAX to one of Kwok's business entities in 2008 (the "PAX Claim").[115] Between April 2013 and June 2015, Kwok and PAX were parties to a Deed of Settlement under which it was contemplated that the PAX Claim would no longer be due and owing if certain conditions occurred. These conditions did not occur, and the PAX Deed of Settlement was terminated in June of 2015.[116]

44.     On April 18, 2017, PAX filed a complaint in the State Court asserting Kwok's liability in connection with the PAX Claim under a theory of breach of contract related to the 2011 Personal Guarantee.[117] On April 18, 2019, PAX amended its complaint to include Genever

---

[112] *Id.*

[113] Ex. 60, Letter from Kevin M. Kearney of Hodgson Russ LLP, dated April 7, 2021 at 2, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 766 (Noting that payments to Hodgson Russ were made by Golden Spring as well as ACA Capital and a third Kwok-linked entity, Ziba Limited).

[114] Ex. 61, Decision and Order, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 549, at 7 ("the Court finds Kwok liable for breach of the 2011 Personal Guarantee.").

[115] *Id.*

[116] *Id.* at 7.

[117] *See* Ex. 62, Complaint, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 2.

US and Genever BVI as defendants and to assert that such entities' corporate veils should be pierced and that they should be held jointly and severally liable for Kwok's breach of contract.

### ii.    PAX's Efforts to Seek Prejudgment Attachment

45.    In 2017 and 2018, PAX filed multiple prejudgment attachment motions in the State Court in an effort to prevent Kwok from dissipating his assets, including the Sherry Netherland Apartment.[118]  As a result of these motions, the State Court entered an order on April 26, 2019, which required Kwok and the Genever Entities to provide PAX written notice of any contract to sell, assign, transfer, or pledge the Sherry Netherland Apartment.

46.    PAX's first prejudgment attachment motion, filed on July 7, 2017, became moot upon the State Court's dismissal of the State Court Action on *forum non conveniens* grounds on September 20, 2017, a decision that was reversed by the Appellate Division on April 4, 2018. PAX filed a second prejudgment attachment motion on April 24, 2018 (the "Second Prejudgment Attachment Motion").[119]

### iii.    Kwok Opposes Attachment by Alleging Existence of Pledges

47.    Kwok's May 16, 2018, opposition to the Second Prejudgment Attachment Motion argued, among other things, that the Sherry Netherland Apartment could not be subject to attachment because "pursuant to a pledge and security agreement entered into in or about May 2015 . . . the assets of Genever BVI, which by virtue of its ownership of Genever USA include

---

[118] Ex. 63, Memorandum of Law in Support of Plaintiff Pacific Alliance Asia Opportunity Fund L.P.'S Motion for Pre-Judgment Order of Attachment, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 28 (July 7, 2017), Ex. 64, Memorandum of Law in Support of Plaintiff Pacific Alliance Asia Opportunity Fund L.P.'S Motion for Pre-Judgment Order of Attachment, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 123 (April, 4, 2018), Ex. 65, Pacific Alliance Asia Opportunity Fund L.P.'s Memorandum of Law in Support of its Motion for Pre-Judgment Order of Attachment, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 250 (November 28, 2018).

[119] Ex. 66, Notice of Plaintiff's Motion for Pre-Judgment Order of Attachment, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 122 (April 24, 2018).

the Apartment, were pledged to an entity named Roscalitar 2, an exempted company

incorporated in the British Virgin Islands."[120]

48.     Kwok's May 16, 2018, opposition was supported by an affidavit of Ms. Wang

dated May 15, 2018 (the "2018 Wang Affidavit").  In the 2018 Wang Affidavit, Ms. Wang

identified herself as president of Golden Spring and "administrator for the interests of [Kwok] . .

. and his family." [121]   The 2018 Wang Affidavit further asserted that Kwok was "the sole

shareholder of Genever BVI" and that "the shares of Genever BVI have been pledged as

collateral to a third party Roscalitar 2."[122]  In addition, the 2018 Wang Affidavit acknowledged

that Kwok held an "ownership interest" in the Sherry Netherland Apartment, though it was "not

in real property" but was an "ownership interest in certain shares of the Sherry Netherland."[123]

49.     In PAX's reply brief in support of the Second Prejudgment Attachment Motion

and at the June 27, 2018 hearing before the State Court, PAX argued that the pledge granted to

Roscalitar 2 had been terminated prior to the commencement of the State Court Action.  At the

hearing, counsel to Kwok proudly defended the pledge assertion, remarking that "[f]or the

purpose of the integrity of the Court and myself and the papers that we submit, I want your

Honor to be aware that . . . that lien is still in effect today."[124]  Counsel to Kwok also submitted

to the State Court documents purporting to show the existence of both the Roscalitar 2 pledge

---

[120] Ex. 67, Defendant's Memorandum of Law In Opposition to Plaintiff's Motion for an Order of Pre-Judgment Attachment, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 167 (May 16, 2018).

[121] Ex. 68, Affidavit of Yan Ping Wang at ¶ 1, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 182 (May 15, 2018).

[122] *Id.* at ¶ 5.

[123] *Id.*  at ¶ 2.

[124] Ex. 69, Hr. Tr. at 24:21-26, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 199 (June 27, 2018).

granted in 2015 as well as a second pledge in favor of Blue Capital, granted in February of 2018.[125]

50.     PAX subsequently demonstrated (and it was conceded by Kwok's counsel) that, not only had the Roscalitar 2 pledge been terminated in 2017, but that the Blue Capital pledge had been terminated in June 2018, two weeks prior to the June 27, 2018 hearing.[126]

51.     On June 28, 2018, the State Court issued an order denying the Second Prejudgment Attachment Motion without prejudice, requiring Kwok to notify PAX regarding any contract of sale or assignment of the Sherry Netherland Apartment, and scheduling a hearing on July 10, 2018 at which the parties would appear and enter into an expedited discovery schedule.[127]

52.     Kwok did not raise or disclose the Purported Trust Agreement in connection with his opposition to the Second Prejudgment Attachment Motion.  Upon information and belief, this is because the Purported Trust Agreement did not in fact exist at that time.  Indeed, there would have been no need for Kwok to go through the extensive ruse of alleging that Genever BVI was subject to various liens and/or pledges if, in fact, Genever BVI was beneficially owned by Bravo Luck pursuant to the Purported Trust Agreement.  In addition, such pledges were prohibited by the terms of the Purported Trust Agreement absent the prior written approval of Bravo Luck, and therefore the pledge-based arguments belie the existence of the Purported Trust Agreement at the time the pledge-based arguments were made.

---

[125] Ex. 70, June 27, 2018 Hearing Pledge Documents, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 231 (November 15, 2018).

[126] Ex. 72, Hr. Tr. at 25:24-25, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 281 (March 8, 2019).

[127] Ex. 71, Decision and Order, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 192 (June 29, 2018).

### iv.    PAX Serves Document Discovery Requests

53.    In connection with discovery on the attachment issue scheduled by the State Court, in July 2018 PAX served Kwok with document requests that included a number of Requests for Production ("RFPs") with respect to which the Purported Trust Agreement was responsive.  The RFPs included requests for, among other things, all documents and communications relating to the 2015 purchase of the Sherry Netherland Apartment and all documents and communications relating to any transfer of monies or assets from Genever US to any other person or entity.[128]

54.    Document discovery with respect to the prejudgment attachment issue closed in September 2018.

55.    The Purported Trust Agreement was not disclosed during the discovery period. Upon information and belief, this is because the Purported Trust Agreement did not in fact exist during that time period.

### v.    Kwok's October 2018 Deposition

56.    PAX took Kwok's deposition with respect to the attachment issue on October 3, 2018 (the "October 2018 Deposition").  During the October 2018 Deposition, among other things:

  a)    Kwok denied holding any ownership interest in the Sherry Netherland Apartment,[129] stating that the Sherry Netherland Apartment was in fact owned by an individual named Zhang Wei, allegedly in prison in China.[130] Upon information and belief, Zhang Wei had never been mentioned before in any document filed in the State Court Action.

---

[128] Ex. 73,  Plaintiff Pacific Alliance Asia Opportunity Fund L.P.'S Second Set of Requests for the Production of Documents to Defendant, at ¶¶ 4, 11, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.) (July 13, 2018).

[129]  Ex. 8, Kwok Dep. Tr. at 28:4-15.

[130] *Id.* at 27:15-25.  Zhang Wei is listed on the Hong Kong Restraint Order as an individual (like Han Chunguang) whose bank accounts were subject to Kwok's control.  Hong Kong Restraint Order ¶ 3, Respondent 26.

b)      Kwok denied that he controlled Genever Holdings Corporation, alleging that it was controlled by Zhang Wei.[131]

c)      Kwok took the position that PAX could not attach the Sherry Netherland Apartment because he did own it, but rather Zheng Wei did.[132]

d)      Kwok claimed to have in his possession a written agreement evidencing Zhang Wei's ownership of the Apartment.[133]  Kwok's counsel subsequently reported to PAX's counsel that Kwok did not have this document and would not be producing it. [134]

e)      Kwok denied that he was the sole shareholder of Genever BVI (contradicting, among other things, the Wang Affidavit).[135]

f)      When asked whether his son had any ownership of Genever BVI, Kwok stated that he did not know.[136]

g)      When asked whether his son had any role with respect to Genever BVI, Kwok indicated vaguely that his son was some sort of "representative," but upon further questioning responded that he did not know more because "[t]his is something that is affair of Mr. Zhang Wei."[137]

h)      Kwok denied having given the Sherry Netherland an expedited deadline by which to accept his purchase application.[138]  In addition, he claimed to not know or not remember numerous facts, such as whether he had authorized Paul Weiss and Williams & Connolly to communicate with the Sherry Netherland on his behalf. [139]

---

[131] *Id.* at 36:20-24.

[132] *Id.* at 125:13-19.

[133] *Id.* at 119:4-24.

[134] *See* Ex. 105, Email from Edward Moss of O'Melveny & Myers LLP dated October 9, 2018 ("Today in court, Jillian [Searles] told Stuart [Sarnoff] and me that Mr. Kwok does not have the document and therefore you will not be producing it.").

[135] Ex. 8, Kwok Dep. Tr. at 31:25-32:3.

[136] *Id.* at 41:23-25.

[137] *Id.* at 42:19-20.

[138] *Id.* at 86:19-24.

[139] *Id.* at 76:4-7.

33

i)      Kwok denied having any ownership interest Beijing Zenith Holdings Company Ltd. as of 2015, contradicting the letters submitted to the Sherry Netherland on his behalf by Paul Weiss and Williams & Connolly.[140]

j)      Kwok claimed not to know whether he had any relationship with Bravo Luck[141] and not to remember whether he had ever held an ownership interest in Bravo Luck.[142]  He also stated that Bravo Luck was owned by Zhang Wei.[143]

k)      Kwok was asked repeated questions regarding the inquiries made on Mr. Kwok's behalf in 2016 in connection with the contemplated transfer of the Sherry Netherland Apartment to Kwok's Son through a trust, generally denying his involvement and/or claiming not to know or remember.[144]

57.    Notably, despite the numerous questions related to the role of Bravo Luck and Kwok's interest in transferring the Sherry Netherland to his son through a trust, Kwok never once mentioned the Purported Trust Agreement during the October 2018 Deposition.  Upon information and belief, this is because the Purported Trust Agreement did not in fact exist at that time.  Further, there would have been no need for Kwok to go through yet another extensive ruse—alleging without evidence that the Sherry Netherland Apartment was owned by Zhang Wei—if, in fact, such apartment was owned by Bravo Luck pursuant to the Purported Trust Agreement.

---

[140] Ex. 8, Kwok Dep. Tr. at 77:3-6, 16-25.

[141] *Id.* at 81:10-17.

[142] *Id.* at 82:20-22.

[143] *Id.* at 82:17-19.

[144] *Id.* at 105:2-22.

### vi.    Appearance of Purported Trust Agreement

58.    On November 15, 2018, PAX filed its third prejudgment attachment motion (the "Third Prejudgment Attachment Motion").[145]  In Kwok's response dated December 14, 2018, Kwok noted that he had agreed to produce documents and communications regarding, among other things, Kwok's relationship with Genever US and Genever BVI.[146]

59.    Then, on April 22, 2019 (a few days before the April 26, 2019 evidentiary hearing on the Third Prejudgment Attachment Motion), Kwok's counsel sent an email to PAX's counsel stating as follows: "Attached is a document . . . recently obtained by Mr. Kwok, and provided to us, which I am providing to you in accordance with Mr. Kwok's ongoing discovery obligations."[147]  The attached document was the Purported Trust Agreement.

60.    Prior to April 22, 2019, and despite the Purported Trust Agreement being responsive to RFPs issued in July 2018, the Purported Deed of Trust had never surfaced in discovery nor been produced to PAX.

61.    Despite producing the Purported Trust Agreement a few days before the April 26, 2019 evidentiary hearing on the Third Prejudgment Attachment Motion, neither Kwok's attorneys nor Ms. Wang (the president of Kwok's "family office" shell company, Golden Spring), who testified at the hearing, referred to or proffered the Purported Trust Agreement in opposing the motion.  Upon information and belief, Kwok's representatives did not raise or

---

[145] Ex. 65, Pacific Alliance Asia Opportunity Fund L.P.'s Memorandum of Law in Support of its Motion for Pre-Judgment Order of Attachment, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 250 (November 28, 2018).

[146] Ex. 74, Defendant's memorandum of Law in Opposition to Plaintiff's Motion for an Order of Pre- Judgment Attachment, at 6, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 268 (December 14, 2018).

[147] Ex. 75, Email from Jillian Searles of Hodgson Russ LLP disclosing Purported Trust Agreement, dated April 22, 2019.

proffer the Purported Trust Agreement in opposing the Third Prejudgment Attachment Motion because they anticipated the State Court would recognize the document as fraudulent. Indeed, if valid and enforceable, the Purported Trust Agreement could have been a "showstopper" in favor of Kwok in the State Court Action.

62.    The Purported Trust Agreement bears, on its first page, the date of February 17, 2015, a date over a week prior to the initial submission of Kwok's purchase application to the Sherry Netherland on February 26, 2015.

63.    The Purported Trust Agreement states, among other things, that Kwok as "Trustee" "is holding [Genever BVI] and [Genever US] in trust for [Bravo Luck],"[148] and that Bravo Luck "is a beneficial owner of [Genever BVI] and [Genever US]."[149] The Purported Trust Agreement also contains covenants of Kwok as Trustee to not allow any assignment of or execution against Genever US and Genever BVI.

64.    The Purported Trust Agreement allegedly bears the signatures of Kwok (signing on behalf of himself, Genever US, and Genever BVI) and Kwok's Son, signing on behalf of Bravo Luck.

65.    The Purported Trust Agreement states that Genever US was formed at the address of the Sherry Netherland Apartment, even though as of February 17, 2015, the Sherry Netherland Apartment had not yet been purchased and the Purchase Application had not yet been submitted.[150]

---

[148] *Id.* at Background ¶ (4).

[149] *Id.* at Background ¶ (5).

[150] *Id.* at Intro. ¶ (3)

66.     To the extent the Purported Trust Agreement was in fact executed on February 17, 2015 (which the Plaintiff disputes), it was executed in anticipation of the acquisition of the Sherry Netherland Apartment and for the purpose of transferring the value of such apartment to Kwok's Son (through Bravo Luck).[151]  And to the extent the Purported Trust Agreement was executed after March 6, 2015 (i.e., at a time when Genever US already held title to the Sherry Netherland Apartment), it was executed for the purpose of transferring the value of such apartment to Kwok's Son (through Bravo Luck).

67.     The Purported Trust Agreement contains a choice of law provision stating that it "shall be governed by and construed in accordance with the law of the State of New York" and that the "construction, interpretation, implementation and enforcement of [the Purported Trust Agreement] shall be governed by the laws and regulations of the State of New York."[152]

68.     Upon information and belief, no consideration was paid to Genever BVI in connection with the alleged execution of the Purported Trust Agreement.

### vii.    PAX Prevails on Merits

69.     On September 15, 2020, PAX prevailed on its motion seeking summary judgment on its breach of contract claim against Kwok.[153]  PAX's veil-piercing claims against Genever US and Genever BVI remained pending.  Notably, the State Court ruled that Kwok was estopped from challenging the authenticity of key documents underlying the PAX claim, including the 2011 Personal Guarantee (which during a deposition held in late 2019 Kwok for the first time denied having signed) on the grounds that Kwok's representative had submitted these same

---

[151] *Id.* at Background ¶ (3).

[152] *Id.* at Decl. ¶ 4.

[153] *See* Ex. 61, Decision and Order. An appeal of this decision is pending.

documents to the State Court in 2017 to support of Kwok's motion to dismiss the State Court

Action on *forum non conveniens* grounds.

70.      On February 3, 2021, the State Court entered an order awarding PAX a judgment

in connection with its breach of contract claim in the amount of $116,402,019.57 (the "PAX

Judgment").[154]

### viii.      State Court Issues Restraining Orders

71.      On September 25, 2020, PAX filed a motion in the State Court seeking a

restraining order pursuant to New York Civil Practice Law & Rule ("CPLR") 5229, alleging,

among other things, that Kwok would "take steps to dissipate his assets or otherwise frustrate the

judgment in this case" (the "CPLR Motion").[155]

72.      On September 30, 2020, the State Court entered a temporary restraining order

restraining Kwok from, among other things, "making or causing any sale, assignment, transfer,

or interference with any property in which he has an interest."[156]

73.      On October 15, 2020, the State Court held a hearing with respect to PAX's CPLR

Motion and Kwok's opposition thereto.  At the hearing, the State Court stated in comments

directed at Kwok and his counsel:

> a)      "The Court believes . . .  that Mr. Kwok has attempted to mislead the
> Court.  The Court believes that Mr. Kwok is, as the plaintiff contends,
> playing a shell game with his assets, and has violated if not the letter of
> court orders, the spirit of court orders."[157]

---

[154] Ex. 76, Judgment, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 716.

[155] Ex. 77, Memorandum of Law in Support of PAX's CPLR 5229 Motion and Request for TRO at 5, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 576.

[156] Ex. 78, Decision and Order on Motion, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 591.

[157] Ex. 79, Tr. at 21:13-16, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 647.

b)    "[W]e are not going to have any more shell games. Wherever these assets are held, they are going to remain held where they presently reside, and if it's determined that the entities that are presently listed as the owners of the assets are the alter ego of Mr. Kwok or are wholly dominated and controlled by Mr. Kwok, those assets will be made available to satisfy any judgment that the plaintiff recovers."[158]

c)    "The intent here which is very clear and specific is that in this 2017 case in which there's been a great deal of gamesmanship, a great deal of dissembling, and some flagrant disregard of court orders, I want to know if any transaction is going to take place in which Mr. Kwok is the guiding hand that's something other than an ordinary course of business transaction."[159]

d)    "[O]rders of the Court are either flaunted or exceedingly liberally interpreted, and . . . intentional or unintentional misstatements that have misled the Court have been made to the Court."[160]

74.    On the same day, October 15, 2020, the State Court entered an order (the "October 2020 Restraining Order") providing that Kwok "and/or the registered owners of (1) the Residence at the Sherry Netherland Hotel and (2) the yacht, 'the Lady May' are restrained from making or causing any sale, assignment, transfer, or interference with those assets."[161]

## G.    Genever US Chapter 11 Case

### i.    Filing of Genever US Chapter 11 Petition

75.    On October 12, 2020, shortly before the October 15, 2020 hearing on PAX's CPLR Motion, Genever US commenced the Genever US Chapter 11 Case.

76.    Genever US's chapter 11 petition (the "Genever Petition") was signed by Ms. Wang as an "authorized representative" of Genever US. The Genever Petition included as an

---

[158] *Id.* at 22:7-14.

[159] *Id.* at 24:8-14.

[160] *Id.* at 26:5-8.

[161] Ex. 80, Decision and Order at 1, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 630 (emphasis added).

attachment the Company Resolutions of Genever US authorizing the filing, signed by Kwok on behalf of Genever BVI.  The Company Resolutions contain no signature of Kwok's Son or other purported representatives of Bravo Luck.

77.    The list of equity holders filed with the Genever Petition, signed by Ms. Wang, listed Genever BVI as the only equity holder.

78.    Ms. Wang's declaration filed with the Genever Petition (the "<u>Wang First Day Declaration</u>") stated that the Purported Trust Agreement "recognizes [Bravo Luck] as the beneficial owner of" the Sherry Netherland Apartment, and that Bravo Luck "is a company owned by" Kwok's Son.[162]  The Wang First Day Declaration also stated that "[c]ontrary to published reports, [Kwok] does not have an ownership interest in" the Sherry Netherland Apartment.  This was also contrary to Ms. Wang's testimony in the 2018 Wang Affidavit, where she had acknowledged that Kwok held an "ownership interest" in the Sherry Netherland Apartment, though it was "not in real property" but was an "ownership interest in certain shares of the Sherry Netherland."[163]

79.    The Wang First Day Declaration made no mention of the name Zhang Wei, despite Kwok's prior assertion during the October 2018 Deposition that an individual named Zhang Wei owned Bravo Luck.

80.    On January 22, 2021, Genever US filed a declaration of Kwok in which Kwok stated that he had personally funded the $27,000 retainer paid to Genever US's bankruptcy counsel [Genever Main Case Docket No. 40-2] and that he had "borrowed the monies to fund the

---

[162] Ex. 81, Petition, *In re Genever Holdings LLC*, Case No. 20-12411-jlg (Bankr. S.D.N.Y.), ECF No. 1, Wang First Day Declaration ¶ 4.

[163] Ex. 68, Affidavit of Yan Ping Wang at ¶ 2, PAX v. Kwok, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 182 (May 15, 2018).

payment from an unrelated third party not involved in this case."[164]

###### ii. Bravo Luck's Claim Against Genever US

81.    In connection with filing the Bravo Luck Proof of Claim, executed by Kwok's

Son on March 5, 2021, Bravo Luck argued as follows:

> Bravo Luck was always intended to be the ultimate owner of the
> Apartment, however, after initial discussions between [Kwok's Son]
> and/or his agents, [Kwok's Son] was advised that the Application would
> likely be more successful if an older, more established individual was the
> nominal Applicant. Therefore, [Kwok] was brought in to be the
> established individual supporting [Genever US's] application for the
> Apartment. Bravo Luck, [Kwok], the [Genever US] and [Genever BVI] .
> . . entered into [the Purported Trust Agreement] to make clear that
> [Kwok] as the trustee was holding the Genever Entities and the income,
> profits, and dividends thereof (if any) in trust for Bravo Luck as the
> beneficial owner of the Genever Entities and, thus, the Apartment.[165]

82.    Bravo Luck then asserted that it was "the beneficial owner of the Apartment with

the Apartment being held in trust by [Kwok] and the Genever Entities for Bravo Luck's

benefit."[166]

83.    In the alternative, Bravo Luck asserted a $76 million unsecured claim, in the

event "a court with jurisdiction over Bravo Luck determines that Bravo Luck does not own the

Apartment by virtue of the Apartment being held in trust by [Kwok] and the Genever Entities"

based on Bravo Luck's "advancement of funds for the purchase of the Apartment and any other

funds advanced to maintain the Apartment."[167]

---

[164] Ex. 82, "Lar-Dan" Declaration of Kwok Ho WanA/K/A Miles Kwok in Connection With Retention of Goldberg Weprin Finkel Goldstein LLP, As Counsel for the Debtor, *In re Genever Holdings LLC*, Case No. 20-12411-jlg (Bankr. S.D.N.Y.), ECF No. 40 (January 22, 2021).

[165] Ex. 83, Proof of Claim, Addendum ¶ 2, *In re Genever Holdings LLC*, Case No. 20-12411-jlg (Bankr. S.D.N.Y.), Claim 4-1 (March 5, 2021).

[166] *Id.* at ¶ 6.

[167] *Id.* at ¶ 7.

84.     In addition to the Bravo Luck Proof of Claim, PAX filed a proof of claim against Genever US on the grounds that Genever US was an alter ego of Kwok.  Upon information and belief, numerous other creditors of Kwok also hold alter ego claims against Genever US, and such creditors did not receive notice of the Genever US Chapter 11 Case or the applicable bar date for filing proofs of claim against Genever US.

85.     Upon information and belief, such creditors of Kwok also hold alter-ego claims against Genever BVI.

### iii.    Genever US Chapter 11 Litigation and Settlement

86.     On December 16, 2020, PAX filed a motion seeking relief from the automatic stay to proceed with the State Court Action in connection with Genever US [Genever Main Case Docket No. 13] (the "PAX Relief from Stay Motion").

87.     In their objections to the PAX Relief from Stay Motion, Bravo Luck and Genever US both took the position that issues regarding the ownership of the Genever Entities should be decided in previously commenced BVI litigation between PAX, Bravo Luck, and the Genever Entities (the "BVI Litigation").[168]

88.     On January 8, 2021, PAX filed a motion seeking the conversion of the Genever US Chapter 11 Case to chapter 7 or, in the alternative, appointment of a chapter 11 trustee [Genever Main Case Docket No. 29] (the "PAX Conversion Motion").

89.     On January 27, 2021, Bravo Luck filed its objection to the PAX Conversion Motion (again asserting that Bravo Luck's ownership issues should be resolved in BVI).  In

---

[168] Ex. 84, Objection of Bravo Luck Limited to Motion of Plaintiff Pacific Alliance Asia Opportunity Fund L.P. to Modify the Automatic Stay to Proceed with State Court Litigation, and Related Relief, *In re Genever Holdings LLC*, Case No. 20-12411-jlg (Bankr. S.D.N.Y.), ECF No. 21 (January 5, 2021), Ex. 85, Debtor's Response and Reservation of Rights with Respect to the Motion of Pacific Alliance Asia Opportunity Fund for Relief from the Automatic Stay, *In re Genever Holdings LLC*, Case No. 20-12411-jlg (Bankr. S.D.N.Y.), ECF No. 22 (January 5, 2021).

addition, the Sherry Netherland filed a joinder to the PAX Conversion Motion, stating, among

other things, that:

> When he applied for the requisite approval of the Sherry's Board of
> Directors of his purchase of the Residence in February and March of
> 2015, [Kwok] and his personal attorney represented, among other things,
> that [Kwok] was the beneficial owner of [Genever US] and the [Genever
> US's] parent, Genever Holdings Corporation. In reliance upon those
> representations—including that [Kwok] was the beneficial owner of
> [Genever US], the sole purchaser of the Residence—the Board of
> Directors of the Sherry approved the sale of the Residence to the
> [Genever US].[169]

90.     The Sherry Netherland stated that "[Genever US's] and [Kwok's]

misrepresentations and fraudulent behavior call into question [Genever US's] ability to act as a

fiduciary of the estate and maximize the value of the estate."[170]

91.     On February 26, 2021, following negotiations between Genever US, Bravo Luck,

and PAX (together, the "Genever Settlement Parties"), the Genever Settlement Parties executed a

settlement agreement (as amended, the "Genever Settlement Agreement"), that was eventually

approved by Judge Garrity, in amended form, pursuant to an order issued on October 8, 2021

[Genever Main Case Docket No. 141]. The Genever Settlement Agreement provided that the

PAX Relief from Stay Motion and PAX Conversion Motion would be resolved and that the

Sherry Netherland Apartment would be sold, with such sale to be overseen by a Sales Officer.[171]

---

[169] Ex. 86, Joinder and Reservation of Rights of The Sherry-Netherland, Inc. with Respect to Pacific Alliance Asia
Opportunity Fund L.P.'s Motion for an Order under 11 U.S.C. § 1112(b) Converting the Debtors Case to a Case
Under Chapter 7 or, in the Alternative, for an Order under 11 U.S.C. § 1104(a) Appointing a Trustee to Administer
the Debtors Estate, at ¶ 2, *In re Genever Holdings LLC*, Case No. 20-12411-jlg (Bankr. S.D.N.Y.), ECF No. 45
(January 27, 2021).

[170] *Id.* at ¶ 4.

[171] Ex. 87, Second Amended Settlement, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No.
131-1 (September 24, 2021).

92.     The Genever Settlement Agreement also provided for relief from stay to allow PAX to prosecute the State Court Action[172] and that "nothing in this Agreement shall prejudice the rights of any Party, including Bravo Luck and PAX, from proceeding with any and all claims, if any, against anyone, including Bravo Luck, [Kwok], [Kwok's Son], or any of his or its affiliates, and PAX or any of its affiliates, in BVI, State Court, or otherwise, and Bravo Luck and PAX reserve all rights to oppose such claims in the applicable forum."[173]

93.     As of the date of the filing of this Complaint, the Sales Officer continues to oversee the sale process contemplated by the Genever Settlement Agreement.

**H.     In State Court Action, PAX Seeks Turnover of Shares of Genever BVI**

94.     On June 21, 2021, PAX filed a motion seeking the turnover of the shares of Genever BVI owned by Kwok (the "Turnover Motion").[174]  PAX noted in the Turnover Motion that Kwok had "belatedly produced" the Purported Trust Agreement,[175] that PAX would demonstrate at the appropriate moment that the Purported Trust Agreement was a "fraudulent, backdated document that is not worth the paper on which it was printed,"[176] and that "*in four years of litigation, Kwok never once dared raise this dishonest argument before this Court.*"[177]

---

[172] *Id.* at ¶ 7.a.

[173] *Id.* at ¶ 7.b.

[174] Ex. 88, Notice of Plaintiff Pacific Alliance Asia Opportunity Fund L.P.'s Motion for a Turnover Order Against Defendant Miles Kwok and Appointment of a Receiver, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 845 (June 21, 2021), Ex. 89, Memorandum of Law in Support of Plaintiff Pacific Alliance Asia Opportunity Fund L.P.'s Motion for a Turnover Order Against Defendant Miles Kwok and Appointment of a Receiver, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 846 (June 21, 2021).

[175] Ex. 89, Memorandum of Law in Support of Plaintiff Pacific Alliance Asia Opportunity Fund L.P.'S Motion for a Turnover Order Against Defendant Miles Kwok and Appointment of a Receiver, at 9, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 846 (June 21, 2021).

[176] *Id.* at 10.

[177] *Id.* (emphasis in original).

95.     On July 23, 2021, Kwok filed an objection to the Turnover Motion (the "Turnover Objection") on the grounds that it was an "end run around" of the contemplated State Court Action trial on alter ego issues, the Genever US Chapter 11 Case, and the BVI Proceeding.[178] **_Of note, Kwok never raised the Purported Trust Agreement in the Turnover Objection._**  Upon information and belief, this is because Kwok and/or his counsel anticipated that the State Court would recognize the document as fraudulent.

96.     On September 22, 2021, the State Court held a hearing on the Turnover Motion, at which hearing the State Court ruled in favor of PAX based on, among other things, Kwok's admission, in a December 4, 2020 interrogatory response signed by Kwok, that Kwok was "the legal owner of the issued shares of [Genever BVI]."[179]

97.     On the same day, the State Court entered an order granting the Turnover Motion (the "State Court Turnover Order") and ordering Kwok to "take whatever steps are necessary in the British Virgin Islands to turnover all share certificates with respect to his 100% ownership interest in [Genever BVI]."[180]

98.     The State Court Turnover Order was conditioned on the approval of Justice Adrian Jack of the BVI Court (who had previously issued a stay in the BVI Litigation).[181]  On

---

[178] Ex. 90, Defendant Mr. Kwok Ho Wan's Opposition to Motion for a Turnover Order Against Defendant Miles Kwok and Appointment of a Receiver, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 874 (July 23, 2021)

[179] Ex. 91, Defendant Kwok's Responses and Objections to Plaintiff Pacific Alliance Asia Opportunity Fund L.P.'s Third Set of Interrogatories, at 9, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 756 (April 28, 2021).

[180] Ex. 92, Decision and Order on Motion, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 904 (September 22, 2021).

[181] Ex. 93, Justice Adrian Jack's Order, at 1, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 1089 (January 7, 2022).

December 8, 2021, Justice Jack entered an order modifying the stay issued in the BVI Litigation to permit the transfer of the Genever BVI shares to PAX.[182]

99.     Consistent with his pattern of flouting court orders, however, Kwok never turned over his shares in Genever BVI to PAX.[183]   On January 7, 2022, PAX filed a motion seeking an order of civil contempt against Kwok based on his failure to comply with the State Court Turnover Order, which motion remained pending as of the commencement of the Kwok Chapter 11 Case on February 15, 2022.

## I.     Final Contempt Decision

100.     On February 9, 2022, the State Court issued its decision imposing a $134 million contempt fine upon Kwok based on the removal of the Lady May from the United States in contravention of the State Court's orders (the "Final Contempt Decision").

101.     While the Final Contempt Decision chiefly concerned issues related to the Lady May, the State Court made a number of factual findings that are relevant to this Complaint. Among other things, the State Court found that:

   a)     Kwok had made "efforts to avoid and deceive his creditors by parking his substantial personal assets with a series of corporations, trusted confidants, and family members."[184]

   b)     Kwok, "who is a self-declared multi-billionaire, had secreted his assets in a maze of corporate entities and with family members."[185]

---

[182] *Id.*

[183] Eventually, the shares of Genever BVI would be transferred to the Trustee pursuant to this Court's order dated August 10, 2022 [Docket No. 717] (the "Corporate Governance Order"). Ex. 94, Corporate Governance Order, *In re Ho Wan Kwok*, Case No. 22-50073 (JAM), ECF No. 717 (August 10, 2022)

[184] Ex. 95, Final Contempt Decision at 1, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 1181.

[185] *Id.*

c)      Kwok's use of corporate entities to shield assets from creditors was a "scheme" that had "enabled Kwok to assert that he has no assets despite his lavish lifestyle."[186]

d)      "[Kwok] . . . has utter contempt for this Court and the judicial process."[187]

e)       "The machinations associated with the shell game Kwok has orchestrated with respect to the Lady May are of a piece with every other evasive and contemptuous act Kwok has taken during the five years this litigation has been pending, which is why there are 1,180 docket entries in this case."[188]

### J.      Kwok Continues His Shell Game in His Chapter 11 Case

102.    In response to the issuance of the Final Contempt Decision,[189] on February 15, 2022 (the "Petition Date"), Kwok commenced his chapter 11 case by filing his chapter 11 petition [Main Case Docket No. 1] (the "Initial Petition") and Official Form 104, titled "For Individual Chapter 11 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims Against You *and Are Not Insiders*" [Main Case Docket No. 4] (the "Top 20 Creditors List") (emphasis added).

103.    Throughout the Kwok Chapter 11 Case, Kwok has continued his shell game of using shell companies and family members to plead poverty while living in the lap of luxury.

104.    In Kwok's Initial Petition and in his amended chapter 11 petition filed on February 23, 2022 [Main Case Docket No. 19] (the "Amended Petition" and, together with the Initial Petition, the ("Petitions")), Kwok, among other things, failed to disclose the pending

---

[186] *Id.*

[187] *Id.* at 4.

[188] *Id.* at 7.

[189] *See, e.g.*, Ex. 23, Tr. of Telephonic 341 Meeting of Creditors at 15:21-16:1 ("[I]n mid-February in my second trial . . . I was given a fine of $120 million and I was ordered to pay it off within five days. So without any choices -- so I filed bankruptcy application at Connecticut state and Chapter 11."). Kwok has appealed the Final Contempt Decision.

Genever US Chapter 11 Case even though Genever US was his affiliate. [190]  In response to the Petitions' instruction to disclose, "Where you live," Kwok stated "c/o Golden Spring (New York) Ltd" and inserted Golden Spring's address. [191]  Kwok also listed shell companies Golden Spring and Lamp Capital as the only holders of undisputed claims on his Top 20 Creditors List and amended versions thereof [Docket Nos. 10, 20].

### i.   Kwok Denies Holding Assets or Earning Income

105.    On March 9, 2022, Kwok filed his schedules [Main Case Docket No. 78] (the "Schedules") and statement of financial affairs [Main Case Docket No. 77] ("SOFA").  These documents in particular, along with their associated global notes (the "Global Notes") attached to the SOFA, help encapsulate how Kwok has played his shell game in the Kwok Chapter 11 Case.  Among other things:

a)   Despite voluminous public evidence of Kwok's wealth, including court documents signed by Kwok under penalty of perjury, [192] the Schedules reported that the total value of Kwok's property was ***$3,850.00***, as compared with scheduled unsecured claims of $373,803,498.09, over $250 million of which consisted of the claims of PAX, with the remainder including numerous claims related to securities fraud, defamation, and sexual assault.

---

[190] Ex. 96, Amended Petition, at 3 (Petition Item 10), *In re Ho Wan Kwok*, Case No. 22-50073 (JAM), ECF No. 19 (February 23, 2022).

[191] *Id.* at 2 (Petition Item 5).

[192] *See* Ex. 33, Particular of Claims at ¶ 1 (describing Kwok as "high net worth individual"). *See also* Rolfoundation Rule of Law Fund Live 2020/07/22 Mr. Guo Wengui live." YouTube, July 22, 2020, https://www.youtube.com/watch?v=6d-Jcq0wr7U ("Everyone knows that a while ago, I advised to my family fund and our collaboration fund, and based on my decision, (we) purchased oil futures. Everyone knows that (we) made almost less than a little less than $30 billion. At the time I told them, if money is made, 90% (of the profits) belong to you; if money is lost, all belongs to me. Then all went in and 1 billion barrels (of oil futures) were bought. Now the 1 billion barrels made a profit of $30 billion, and I made at least $3 billion, right?") (based on informal translation from Chinse audio); *See* VICE News, "Exiled Chinese Billionaire Uses YouTube to Wage a War on Corruption," YouTube" (original air date on HBO, Nov. 15, 2017), https://www.youtube.com/watch?v=LkOsgh5kcgQ (In this video, Kwok describes various of his assets, including the Sherry Netherland Apartment ("I buy the apartment"), the Lady May ("my yacht"), the "most luxurious apartment in London," "two private jets," and "hundreds of race cars".  Kwok also comments on his great wealth generally, stating, "I have the wealthy life that everyone in the world dreams about," and "I don't have any material needs anymore.").

b)      Kwok scheduled $0.00 of income, stating that: "[Kwok] does receive support funded by family and companies controlled by family for housing, household and living expenses. None of the funding related to housing, household or living expenses is subject to any claim by the funding source and all housing, household and living expense funding is without any agreement or expectation to be repaid."

c)      Kwok scheduled $0.00 of expenses, stating that: "all expenses of any kind including housing, household and living, are funded by third party family members or by companies they control. [Kwok] has no expenses for which he is personally liable."

d)      Kwok scheduled Golden Spring (his "family office") as holder of **secured claims** against Kwok of an unknown value based on certain litigation funding agreements.  As noted above, Kwok had previously listed Golden Spring as holder of **unsecured claims** on his Top 20 Creditors List.

e)      In his SOFA, Kwok listed a number of parties as creditors who had received transfers within the ninety days preceding the Petition Date, thus admitting that Kwok, and not another party, had paid these creditors.[193] At the same time, however, in his Global Notes, Kwok took the position that these payments were made by "family or companies controlled by family"[194] and it appears that at least some of these payments were made by Golden Spring and/or Lamp Capital, thereby confirming that Kwok uses these entities as part of his shell game.

f)      Kwok stated he had "use and occupancy" of the Taconic Road Residence that was owned by Greenwich Land, an LLC whose sole member is Kwok's purported spouse.  Kwok stated that "related costs and expenses associated with the Residence are paid directly by family and family-controlled enterprises."  Relatedly, Kwok denied holding legal title to any household goods and furnishings, electronics, or collectibles.

---

[193] *See* Ex. 97, Global Notes and Statements of Limitations, Methodology, and Disclaimers Regarding the Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs, In re Ho Wan Kwok, Case No. 22-50073 (JAM), ECF No. 77 (March 9, 2022), Page 21 of 25 ("Question # 6 - During the 90 days before you filed for bankruptcy, did you pay any creditor a total of $600 or more").

[194] Notably, Kwok disclosed payments in the 90-day period before the Petition Date made by his shell companies, but refused to recognize the payments of such shell companies to pay for his living expenses as income.  Kwok's apparent explanation for this discrepancy was that the 90-day payments were subject to certain litigation funding agreements and were "reported because there is an expectation of repayment from any proceeds contingent upon the resolution of the litigation."

g)    Kwok stated he had "access to" the Sherry Netherland Apartment and disclosed his ownership of Genever BVI, Genever BVI's ownership of Genever US, and Genever US's ownership of the apartment.  However, Kwok took the position that he held his equity in Genever BVI in trust for Bravo Luck, owned by Kwok's Son, and asserted that Bravo Luck funded the purchase of the apartment using funds that "came from entities owned or controlled by Kwok's Son and not from [Kwok]."

h)    Kwok stated he "has use of automobiles, including luxury automobiles and motorcycles" but that he "has no legal title to any vehicle of any type," and that "costs and expenses associated with such vehicles are provided for directly by family and family-controlled enterprises."

i)    Kwok continued to assert that the Lady May was owned by HK USA and refused to schedule the Lady May as an asset on the grounds that he had appealed the Final Contempt Decision.

j)    Kwok stated that the Hong Kong Restraint Order had frozen "HK$3.7 million of funds alleged to belong to [Kwok]" and "[a]s much as billions more of funds and property, including real estate in Hong Kong, of individuals and entities purportedly subject to Kwok's 'effective control.'" Kwok stated that "[d]ue to the freezing/seizure of these assets, [Kwok] does not include them in his estate," despite the fact that the Hong Kong Restraint Order does not necessarily divest Kwok of ownership of these assets.

106.    Elaborating on the story of Kwok's alleged individual poverty amidst family opulence, Kwok stated in his declaration filed on March 20, 2022 that:

My family, and particularly my son, provides for my needs. Prior to the Petition Date, my son's family office [Golden Spring] purchased, among many other things, my clothing, food, and sundries. I do not have access to a Golden Spring credit card or to a Golden Spring bank account. My family retains ownership of nearly everything I use, aside from my clothing and mobile phones.[195]

107.    According to Kwok, "Justice Ostrager [i.e., the State Court], PAX, and perhaps others believe I have greater financial wherewithal than is reflected here and in my Schedules

---

[195] Ex. 98, Declaration of Mr. Ho Wan Kwok in Support of the Chapter 11 Case and Certain Motions, Docket No. 107 at ¶ 17.

and Statements of Financial Affairs.  The wealth they believe is mine, however, actually belongs

to my son, daughter, wife, and extended family, not me."[196]

108.    Kwok also stated in his declaration filed on March 20, 2022 that he held "the

interest in the [Sherry Netherland Apartment] in trust for my son."[197]

109.    At his section 341 meeting of creditors, Kwok stated that Bravo Luck was owned

by his son.[198]

110.    Upon information and belief, neither Kwok's Son nor his daughter have ever held

gainful employment outside of Kwok's shell companies.

111.    The Schedules and SOFA list numerous creditors of Kwok.  Upon information

and belief, such creditors of Kwok also hold alter ego claims against Genever BVI.

### ii.    Shell Game Funds Kwok Chapter 11 Case and Lifestyle

112.    Throughout the Kwok Chapter 11 Case, Kwok has continued to play his shell

game to ensure that, despite his condition as a chapter 11 debtor claiming no assets or income, he

can continue to live a luxurious lifestyle and benefit from expensive legal representation.

113.    For example, Lamp Capital paid the $1 million retainer of Kwok's initial

bankruptcy counsel, Brown Rudnick.[199]  Kwok's Son then paid the $100,000 retainer of Kwok's

---

[196] *Id.* at ¶ 34.

[197] *Id.* at ¶ 17.

[198] Ex. 4, Tr. of Telephonic 341 Meeting of Creditors, dated April 6, 2022 at 13:21-23.

[199] This payment was made using the proceeds of a purported $1 million loan from Lamp Capital to Kwok that were remitted directly from Lamp Capital to Brown Rudnick. *See* Application of the Debtor for Entry of an Order Authorizing the Employment and Retention of Brown Rudnick LLP as Counsel for the Debtor, Docket No. 86, at ¶ 17; Ex. 4, Tr. of Telephonic 341 Meeting of Creditors, dated April 6, 2022 at 49: 22-24.  At his April 6, 2022 Section 341 meeting, Kwok testified that this loan was not in writing and that he did not know the terms of the loan, why the money had been lent, or what the source of the money was.  *Id.* at 49-51.

subsequent bankruptcy counsel, Zeisler & Zeisler, **which simultaneously serves as counsel to Kwok's Daughter and HK USA.**

114.    Meanwhile, Golden Spring, Lamp Capital, and Greenwich Land have funded Kwok's extravagant lifestyle.  These expenses from the beginning of the Kwok Chapter 11 Case are reflected in the monthly operating reports filed by Kwok for the reporting periods through July 8, 2022, which report an aggregate amount of $583,655.00 paid by a "third party for the benefit of the estate."

115.    Similarly, Kwok relied on Golden Spring as lender in connection with an $8 million DIP loan proposed in Kwok's motion filed on March 22, 2022 [Main Case Docket No. 117].  This loan would have been made to the estate on an unsecured basis, subordinated to the claims of Kwok's pre-petition creditors, and without any administrative or priority repayment rights.  *Id.*  Nevertheless, the record makes clear that Kwok intended to use a significant amount of the funds to pay the professional fees of Brown Rudnick, counsel to the official committee of unsecured creditors (the "Committee"), and numerous proposed "ordinary course" professionals that included, among others, the law firm of Melissa Francis, **Golden Spring's general counsel**.[200]

116.    Kwok also attempted to use HK USA's only asset, the Lady May, as a bargaining chip to offer to creditors in exchange for broad plan releases.  On April 10, 2022, Kwok filed a proposed chapter 11 plan [Main Case Docket No. 197] (the "Proposed Plan").  Among other things, the Proposed Plan contemplated that HK USA would donate the Lady May (for no apparent consideration) to a creditor's trust for the benefit of holders of allowed claims, and that

---

[200]  *See* Ex. 99, Annex 1 to Motion of Debtor for Entry of an Order Authorizing (I) Employment and Payment of Professionals Utilized in the Ordinary Course, (II) Payment of Prepetition Claims, and (III) Granting Related Relief [Main Case Docket No. 119].

broad releases would be extended to Kwok, Golden Spring and HK USA (together referred to as the "Plan Funders"), and "all individuals and entities affiliated with the Plan Funders" (i.e., Kwok's entire network of shell companies and individual family members).[201]

### iii.    Court Orders Appointment of Chapter 11 Trustee

117.    On May 24, 2022, the Court held an evidentiary hearing on the issue of whether to dismiss the Kwok Chapter 11 Case or appoint a chapter 11 Trustee, and on June 15, 2022, the Court issued its decision ordering the appointment of a chapter 11 trustee [Main Case Docket No. 465] (the "Trustee Appointment Decision").

118.    In the Trustee Appointment Decision, the Court found, among other things, that "[Kwok] has demonstrated he can obtain millions of dollars in funds, including the $8,000,000.00 that was the subject of the DIP Motion."[202]

119.    The Court also noted the arguments of creditors that Kwok had "engaged in multilayer transactions involving complicated corporate structures like Golden Spring, Genever Holdings, Lamp Funding, and HK [USA] that make it difficult to identify and locate Kwok's assets."[203]  This "complexity of Kwok's financial affairs and lack of independent managerial oversight in this case warrants the appointment of a Chapter 11 trustee who can investigate, identify, and locate Kwok's assets for the benefit of creditors and the estate."[204]

---

[201] Ex. 100, Proposed Chapter 11 Plan of Ho Wan Kwok, at Art I.A.74, In re Ho Wan Kwok, Case No. 22-50073 (JAM), ECF No. 197 (defining "Plan Funders" as Golden Spring and HK USA); *Id.* at Art I.A.75 (defining "Plan Funder Related Parties" as ":all individuals and entities affiliated with the Plan Funder"); *Id.* at Art I.A.90 (defining "Released Parties" to include, among others "collectively [Kwok], the Plan Funders, the Plan Funder Related Parties").

[202] Ex. 101, Memorandum of Decision and Order Denying Motion to Dismiss Without Prejudice and Granting Joinder to Motion for Appointment of Chapter 11 Trustee (June 15, 2022), Docket No. 465, at 13.

[203] *Id.* at 15.

[204] *Id.* at 16.

### iv.    Kwok Attempts to Frustrate Trustee's Investigation and Administration of Estate to Protect Shell Game From Scrutiny

120.    Since the appointment of the Trustee on July 8, 2022, Kwok has, despite his duty to cooperate with the Trustee under section 521(a)(3) of the Bankruptcy Code, engaged in a tireless effort to stymie the Trustee's administration of Kwok's chapter 11 estate and investigation of Kwok's assets and financial condition.  Among other things, Kwok has:

a)    Sought relief from the order appointing the Trustee;

b)    Opposed the retention of the Trustee's counsel;

c)    Opposed the Trustee's corporate governance motion;

d)    Opposed the Trustee's discovery efforts; and

e)    Appealed the Court's rulings that denied Kwok's motion for relief from the order appointing the trustee and granted the Trustee's corporate governance motion.

121.    In sum, since the Trustee's appointment, hundreds of hours have been devoted to dealing with Kwok's "obstruct[ion] [of] the administration of this estate."[205]   Notably, this obstruction has included Kwok's opposition, based on the Purported Trust Agreement, to the Trustee's effort to take control of Genever BVI through the corporate governance order approved by this Court on August 10, 2022 [Main Case Docket No. 717] (the "Corporate Governance Order"), even though Kwok never raised the Purported Trust Agreement in opposition to PAX's Turnover Motion in the State Action, which similarly sought the surrender of Kwok's shares of Genever BVI.

---

[205] Ex. 102, Aug. 30, 2022 Tr.at 94:19-95:2 ("[A]ll the arguments that you have made has been to stop the trustee from trying to do what the trustee is going to do. If you don't like what the trustee does, then you can sue him. You can do that. There's a remedy. You have a remedy. You can sue him. But you are now obstructing the administration of this estate that all the other creditors have been waiting to have administered.").

**K.**     **Claim of IRS**

122.    On August 10, 2022, the Internal Revenue Service (the "IRS") filed its initial

proof of claim against Kwok [Claim No. 12-1].  On October 6, 2022, the IRS filed an amended

proof of claim against Kwok [Claim No. 12-2].

**L.**     **Commencement of Genever BVI Chapter 11 Case**

123.    On October 11, 2022, Genever BVI filed a voluntary petition for relief under

chapter 11 of the Bankruptcy Code in this Court.[206]

## FIRST CLAIM

### (Purported Trust Agreement is Backdated, Fraudulent Document)

124.    The Plaintiff repeats and realleges the allegations contained in paragraphs 7-123.

125.    Voluminous evidence discussed above demonstrates that the Purported Trust

Agreement is a fraudulent, backdated document and is therefore invalid, void, and

unenforceable.[207]  Among other things:

---

[206] Unsecured creditors who were scheduled in the Kwok Chapter 11 Case or filed proofs of claims against Kwok in the Kwok Chapter 11 Case were included in the Official Form 204, titled "Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders" [Genever BVI Docket No. 1] filed in the Genever BVI Chapter 11 Case (and Genever BVI reserves all rights in regard to such claims).

[207] *See e.g.  JPMorgan Chase Bank v. Kalpakis, 30 Misc. 3d 1236(A), 927 N.Y.S.2d 816 (Sup. Ct. 2011), aff'd sub nom. JP Morgan Chase Bank, Nat. Ass'n v. Kalpakis, 91 A.D.3d 722, 937 N.Y.S.2d 105 (2012)* ("It is . . . well settled that deeds and encumbrances that are forged or executed under false pretenses are the result of fraud in the factum (a/k/a fraud in the execution) and are void ab initio."); *E & H Partners v. Broadway Nat. Bank*, 39 F. Supp. 2d 275, 286 (S.D.N.Y. 1998) ("Falsified documents are the same as no documents at all."); *Mota v. Imperial Parking Systems*, 08 Civ. 9526, at *30 (S.D.N.Y. Aug. 24, 2010) ("Under [New York] State law and general contract law, a forged signature renders a contract void *ab initio*.") *Gorzkowski v. Mod. Gas Sales, Inc.*, No. 163 MDA 2015, 2015 WL 6871135, at *2 (Pa. Super. Ct. Nov. 6, 2015) ("this court found the backdated stock certificates to be invalid"); *U.S. Bank Nat'l Assn. v. Naifeh*, 1 Cal. App. 5th 767, 778, 205 Cal. Rptr. 3d 120, 128 (2016), *as modified on denial of reh'g* (Aug. 17, 2016)("Substantial evidence supported the conclusion that the recorded documents were void or voidable due to fraud . . . .").

a)    The Purported Trust Agreement was allegedly dated February 17, 2015, prior to even the initial submission of the Purchase Application with respect to the Sherry Netherland Apartment, the asset that is the key subject of the Purported Trust Agreement.  Further, the Purported Trust Agreement states the address of Genever US as the Sherry Netherland Apartment, which could not have been the case at that time because the apartment had not yet been acquired.

b)    In June 2016, well more than a year after the Purported Trust Agreement had been allegedly executed, Kwok's representatives inquired with the Sherry Netherland regarding a transfer of the Sherry Netherland Apartment to Kwok's Son through a trust (i.e., exactly the type of trust arrangement exemplified by the Purported Trust Agreement).  These inquiries would have made no sense if the Purported Trust Agreement had in fact existed.

c)    The Purported Trust Agreement was never once mentioned or raised, by Kwok or anyone else during the over four years between (i) its alleged execution date on February 17, 2015 and (ii) the date it was disclosed on April 22, 2019, despite numerous instances when it should have logically been disclosed, such as:

(1)    When Kwok applied to purchase the Sherry Netherland Apartment.

(2)    When Kwok received PAX's requests for production in the State Court Action.

(3)    When Kwok repeatedly argued that the Sherry Netherland Apartment could not be attached because it was subject to pledges or was owned by a third party (Zhang Wei).

(4)    When Kwok was repeatedly asked questions at his deposition regarding his interest in transferring the Sherry Netherland Apartment to his son.

d)    There is a voluminous record, including as discussed in this Complaint, regarding Kwok's use of shell companies to shelter assets from creditors, as well as numerous misrepresentations and false and contradictory statements by Kwok and his representatives.

126.    Therefore, the Plaintiff seeks a ruling, pursuant to Federal Rule of Bankruptcy Procedure 7001(9), declaring that the Purported Trust Agreement is invalid, void, and unenforceable.

## SECOND CLAIM

### (Avoidance of Actual Fraudulent Transfer)
### (Asserted in the alternative to the First Claim)

127.    The Plaintiff repeats and realleges the allegations contained in paragraphs 7-123.

128.    In the alternative, in the event that the Purported Trust Agreement is ruled to be valid and to have resulted in Bravo Luck becoming beneficial owner of the equity of Genever US (and depriving the Plaintiff, sole member of Genever US, of such interest), the Plaintiff asserts a claim of actual fraudulent transfer against Bravo Luck pursuant to Section 276 of the New York Debtor and Creditor Law,[208] made applicable by section 544 of the Bankruptcy Code.[209]

129.    The Purported Trust Agreement contains a choice of law clause stating that the Purported Trust Agreement shall be governed by the law of the State of New York.

130.    The analysis of a debtor's intent to hinder, delay, or defraud under New York law is identical to the analysis under section 548 of the Bankruptcy Code.[210]  A claim of actual intent to defraud under section 548(a)(1)(A) of the Bankruptcy Code requires allegations that the debtor-transferor made a transfer or incurred an obligation with "actual intent" to "hinder, delay or defraud" a past or future creditor.[211]

131.    "Because of the difficulty in proving actual intent to hinder, delay, or defraud in

---

[208] This was the New York statute effective on the date of the transfer.

[209] Genever BVI seeks the avoidance of, not only any conveyance of property by Genever US pursuant to the Purported Trust Agreement (in the event it is held to be valid), but also any obligation incurred by Genever US pursuant to the Purported Trust Agreement.  *See* N.Y. Debt. & Cred. Law § 276 (McKinney) ("Every conveyance made *and every obligation incurred* with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.") (emphasis added).

[210] *In re Combes*, 382 B.R. 186, 193-94 (Bankr. E.D.N.Y. 2008) ("The analysis of the debtor's intent to hinder, delay, or defraud under [section] 548 of the Bankruptcy Code and under New York law is identical.").  The debtor-transferor's intent is at issue in such claims, not the transferee's.  *In re LXEng LLC*, 607 B.R. 67, 91 (Bankr. D. Conn. 2019).

[211] *In re Integrity Graphics, Inc.*, 623 B.R. 21, 29-30 (Bankr. D. Conn. 2020).

making its case, a party can rely on the 'badges of fraud,' which are 'circumstances so

commonly associated with fraudulent transfers that their presence gives rise to an inference of

intent.'"[212]

> Examples of 'badges of fraud' include, *inter alia*: (1) concealing facts and false
> pretenses; (2) an unconscionable discrepancy in consideration received in
> exchange for the value of the property transferred; (3) creating a closely-held
> corporation for property receipt; (4) closeness in relationship between the parties;
> (5) retaining the property in question for benefit or use; (6) the financial condition
> of the transferor and transferee both before and after the transfer(s); (7) repeated
> patterns or cumulative effect of courses of conduct post-insolvency or financial
> troubles; and (8) the timeline of events. . . The transfer of property to a spouse is a
> 'classic' badge of fraud. . . . Asset shifting to different corporate entities wholly
> owned or 'so closely assimilated' by the debtor is an additional badge of fraud.[213]

132.    The facts discussed in this Complaint establish the following sequence of events,

assuming the validity of the Purported Trust Agreement and that it resulted in Bravo Luck

becoming beneficial owner of Genever US.

> a)    On February 17, 2015, Genever BVI, pursuant to the Purported Trust
>       Agreement, effectively transferred its equity interest in Genever US to
>       Bravo Luck.  Genever BVI executed the Purported Trust Agreement in
>       anticipation of the acquisition of the Sherry Netherland Apartment by
>       Genever US and for the purpose of ostensibly allowing Kwok's Son,
>       through Bravo Luck, to own the Sherry Netherland Apartment.

> b)    On March 6, 2015, Genever US acquired the Sherry Netherland
>       Apartment, and, thus, Bravo Luck, as beneficiary under the Purported
>       Trust Agreement, effectively acquired the Sherry Netherland Apartment.

133.    Under this fact pattern, Genever BVI transferred the entire value Genever US

(and, hence, of the Sherry Netherland Apartment) to Bravo Luck and did not receive

consideration in exchange for such transfer.

---

[212] *In re Jie Xiao*, 608 B.R. 126, 157 (Bankr. D. Conn. 2019); *see also In re Andersen*, 166 B.R. 516, 529 (Bankr. D.
Conn. 1994) ("In recognition of that reality, courts have held that fraudulent intent may be inferred from the
circumstances surrounding the transfer.  Indirect evidence of fraud may consist of the circumstances of the transfer
and the conduct and action of the parties to the alleged fraudulent transfer with respect to the possession,
management and control of the premises.") (emphasis added).

[213] *In re Jie Xiao*, 608 B.R. at 157.

134.    The facts discussed in this Complaint demonstrate numerous of the badges of fraud commonly associated with fraudulent transfers.  These include, among others:

a)    "Concealing facts."  Kwok never disclosed the Purported Trust Agreement until April 2019 and in fact took a series of positions inconsistent with the Purported Trust Agreement, including that he was purchasing the Sherry Netherland Apartment himself.

b)    "An unconscionable discrepancy in consideration received in exchange for the value of the property transferred."  The Purported Trust Agreement resulted in Genever BVI transferring a $70 million interest in Genever US (base on the value of the apartment) to Bravo Luck without receiving any consideration in return.

c)    "Creating a closely-held corporation for property receipt" and "closeness in relationship between the parties."  The Purported Trust Agreement resulted in a transfer to Bravo Luck, an entity controlled by Kwok.

d)    "Retaining the property in question for benefit or use."  Kwok retained control of Genever US until the Trustee obtained control of Genever US pursuant to the Corporate Governance Order. Upon information and belief, Kwok has used the Sherry Netherland Apartment as his residence since 2015.

135.    Kwok's fraudulent conduct in this instance is consistent with his *modus operandi*, as found by the State Court, of using shell companies to hold assets out of the reach of creditors: Bravo Luck is where Kwok keeps his Manhattan apartment; HK USA is where Kwok keeps his 150-foot yacht; Greenwich Land is where Kwok keeps his Connecticut mansion; and so forth. Meanwhile Golden Spring and Lamp Capital fund Kwok's enormous living expenses and legal fees.  This is the recipe for Kwok's life as a "penniless" billionaire.

136.    At all relevant times, Genever BVI was indebted to one or more of Kwok's creditors as an alleged alter ego of Kwok.  Such creditors of Genever BVI could have pursued the relief sought in this Complaint by the Plaintiff in exercise of such creditors' rights.

137.    At all relevant times, creditors of Genever BVI (as an alleged alter ego of Kwok) would have had no reason to suspect that the Purported Trust Agreement existed or that Genever

BVI (controlled by Kwok) had used the Purported Trust Agreement to effectuate a fraudulent transfer.

138.    Accordingly, assuming that the relief requested in the First Claim is not granted, the Plaintiff seeks a ruling, pursuant to Section 276 of the New York Debtor and Creditor Law, sections 544 and 550 of the Bankruptcy Code, and Federal Rule of Bankruptcy Procedure 7001(9), (1) declaring the Purported Trust Agreement invalid and (2) avoiding any transfer of Genever BVI's property or any incurrence of any obligation by Genever BVI that occurred pursuant thereto.

### **PRAYER FOR RELIEF**

<u>WHEREFORE</u>, for the foregoing reasons, the Plaintiff respectfully requests that judgment be entered as follows:

1.    On the First Claim, an order declaring, pursuant to Federal Rule of Bankruptcy Procedure 7001(9), that the Purported Trust Agreement is invalid, void, and unenforceable;

2.    On the Second Claim, an order (1) declaring, pursuant to the Section 276 of the New York Debtor and Creditor Law, sections 544 and 550 of the Bankruptcy Code, and Federal Rule of Bankruptcy Procedure 7001(9), that the Purported Trust Agreement is invalid and (2) avoiding any conveyance of Genever BVI's property or any incurrence of any obligation by Genever BVI that occurred pursuant to the Purported Trust Agreement;

3.    Reasonable attorneys' fees, costs, and expenses incurred in this action; and

4.    Such other and further relief as the Court may deem just, proper, or equitable under the circumstances.

*[Remainder of Page Intentionally Left Blank]*

Dated:      December 23, 2022
            New Haven, Connecticut

GENEVER HOLDINGS CORPORATION

By: */s/ Patrick R. Linsey*
      Douglas S. Skalka (ct00616)
      Patrick R. Linsey (ct29437)
      NEUBERT, PEPE & MONTEITH, P.C.
      195 Church Street, 13th Floor
      New Haven, Connecticut 06510
      (203) 821-2000
      dskalka@npmlaw.com
      plinsey@npmlaw.com

*Counsel for Genever Holdings Corporation*
*Debtor and Debtor-in-Possession*